**Patrick HOLERT, Plaintiff,**

v.

**The UNIVERSITY OF CHICAGO, Defendant.**

**No. 90 C 1769.**

United States District Court,
N.D. Illinois, E.D.

Nov. 26, 1990.

Leon E. Lindenbaum, Lindenbaum, Coffman, Kurlander, Brisky & Hayes, Ltd., Chicago, Ill., for plaintiff.

James W. Gladden, Jr., James R. MacAyeal, Mayer, Brown & Platt, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

CONLON, District Judge.

This is a breach of contract action between the University of Chicago and Patrick Holert, a former student in the University's Graduate School of Business. The case arises from Holert's expulsion from the University for allegedly engaging in a "systematic, prolonged and premeditated pattern of harassment" of another student in the Graduate School of Business. Holert seeks a mandatory injunction compelling the University to rescind his expulsion and to award him a Master of Business Administration ("M.B.A.") degree retroactive to June 9, 1989, his scheduled graduation date. In addition, Holert seeks damages for financial losses and humiliation.

A bench trial was conducted on November 19 and 20, 1990. After hearing the testimony of the witnesses and the arguments of counsel, and reviewing the agreed statement of uncontested facts appended to the final pretrial order, the exhibits, deposition excerpts, and proposed findings submitted by both parties, the court enters the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

1. Defendant University of Chicago ("the University") is a not-for-profit corporation duly organized and existing under the laws of the State of Illinois, with its principal place of business located in Chicago, Illinois.

2. Plaintiff Patrick Holert ("Holert") is a citizen of California, who resides in Reseda, California.

3. The fees and expenses Holert incurred in pursuing his M.B.A. degree at the University exceed $50,000.

4. The University is an institution of higher learning. Among its divisions is the Graduate School of Business, which is empowered to grant M.B.A. degrees.

5. A contractual relationship was created between the parties when the University accepted Holert's application into its M.B.A. program in the 1987 autumn quarter.

6. Holert completed 17 of the 20 required courses for an M.B.A. degree prior to the 1989 spring quarter; Holert was scheduled to receive an M.B.A. degree with honors on June 9, 1989.

7. The University refused to award Holert an M.B.A. degree because charges were pending against him before a Graduate School of Business faculty disciplinary committee.

8. Holert and the University agreed to an expedited resolution of the disciplinary committee charges.

9. On August 21, 1989, the University notified Holert that he was retroactively expelled as of March 27, 1989, that he would not receive credit for his 1989 spring quarter courses, and that he would not be awarded an M.B.A. degree. Pl.Ex. 67.[1]

10. Some of the contractual terms and conditions between Holert and the University were embodied in the Graduate School of Business' *Announcements* catalog and its *Dean of Students Handbook,* as well as in the University's *Student Information Manual.*

11. The *Announcements* catalog specified that an M.B.A. candidate must satisfactorily complete 20 courses in the Graduate School of Business to earn a degree. The catalog also provides that all University students agree to abide by the University's rules set forth in the *Student Information Manual.* The manual is given to all University students upon matriculation.

12. The 1988–1989 edition of the *Student Information Manual* provided in relevant part:

> Personal abuse, whether oral or written, exceeds the bounds of appropriate discourse and civil conduct. An individual who harasses another because of his or her race, sex, sexual orientation, ethnic background, religion, expression of opinion, or any other factor irrelevant to participation in the free exchange of ideas may be made subject to the grievance and student disciplinary procedures [described in the manual].

13. Sherry Jarrell, a Ph.D. candidate, first notified the Graduate School of Business of alleged harassment by Holert and two other M.B.A. students, Valerie Wakahiro and William Orr, in April 1989. Holert and Jarrell lived in adjoining apartments in the University's residential apartment building located at 5110 S. Kenwood Avenue in Chicago. Orr and Wakahiro, who lived together, were Holert's friends; Orr and Wakahiro did not personally know Jarrell.

14. The alleged harassment included pounding on the common wall between Jarrell's and Holert's apartments, yelling obscenities and threats through the common wall,[2] abusive telephone calls, as well as mail theft and the illegal use of Jarrell's credit cards stolen from her mailbox.

15. Jarrell was dating George Easton, an assistant professor in the Graduate School of Business. On April 21, 1989, Easton filed a charge against Holert for leaving a threatening message on Easton's answering machine; Easton also complained about threats to Jarrell through a common wall between Jarrell's and Holert's apartments and harassing telephone calls to Jarrell. Pl.Ex. 8. Holert responded in a letter dated April 27, 1989, by

---

1. Under the University rules, Holert would be eligible to reapply eleven quarters following the date of expulsion. *Id.*

2. According to Jarrell's complaint, Holert periodically screamed "bitch," "you ugly bitch," and "I'm going to get you" through the wall. Pl.Ex. 21, pp. 8, 9.

denying the charges. Pl.Ex. 9. In his response, Holert stated that,

> I have never contacted Ms. Jarrell by telephone and I do not know her telephone number either.

*Id.*

16. On May 5, 1989, Jarrell sent Dean Harry Davis of the Graduate School of Business a 22–page letter describing in chronological detail alleged pervasive harassment by Holert, Wakahiro and Orr over a five-month period. Pl.Ex. 1. Jarrell requested that her letter not be released to Holert, Wakahiro and Orr. *Id.* Holert was not provided a copy of Jarrell's May 5th letter.

17. Dean Davis and Kevin Martin, the dean of students for the Graduate School of Business, decided shortly prior to May 8, 1989, to convene a disciplinary committee to consider the allegations regarding Holert. The initial meeting of the disciplinary committee was held on May 8, 1989.

18. Since 1987, it has been the practice of the Graduate School of Business to select disciplinary committee members from its own faculty on a rotating, sequential basis.[3] It is the individual faculty member's responsibility to determine whether any potential conflict of interest exists in a specific case.

19. The three Graduate School of Business faculty members on the disciplinary committee convened to consider these charges were Richard Leftwich, Katherine Schipper and Douglas Diamond. In addition, Dean Martin and Dean Davis attended the committee's meetings, but did not vote.

Edward Turkington, the University's Deputy Dean of Students, attended all except the last meeting on August 16, 1989.

20. Leftwich, Schipper and Diamond had limited professional and casual contacts with Sherry Jarrell's brother, Greg Jarrell, who received his Ph.D. from the University in 1977. Gregg Jarrell was a professor of economics at the University of Rochester during the relevant period and had no contact with disciplinary committee members during the events at issue or the pendency of his sister's complaint against Holert. Schipper had one conversation with Sherry Jarrell regarding her dissertation.

21. On May 22, 1989, Dean Martin notified Holert that the disciplinary committee would meet on May 30, 1989,

> [T]o review the cases brought against you by George Easton and Sherry Jarrell. At the same time the committee will review the facts surrounding allegations exchanged between Ms. Jarrell and Mr. Easton, on the one hand, and William Orr and Valerie Wakahiro on the other.[4] Since this is a formal hearing, you may elect to have a student present during the deliberations. If you would like to authorize me to assign a student to be present, I would be happy to do so.

Pl.Ex. 14. Dean Davis invited Holert to call him if Holert had any questions. *Id.*

22. Holert testified at trial that he unsuccessfully attempted to reach Dean Davis by telephone on May 25 and 26, 1989. Dean Davis denied that he received any telephone messages from Holert.[5]

---

**3.** According to Dean Davis, the Graduate School of Business does not follow the usual practice set forth in the University's *Student Information Manual* with respect to inclusion of a faculty member from another school or division within the University because the Graduate School of Business has a relatively large faculty (38). The *Student Information Manual* itself recognizes that there are "minor variations" in disciplinary procedures among the schools and divisions within the University. Pl.Ex. 49.

**4.** Orr and Wakahiro filed countercharges of harassment and fabrication against Easton and Jarrell. Pl.Ex. 1.

**5.** Holert claims he was trying to reach Dean Davis to request that a student representative attend the May 30th meeting and to inquire about his rights. Since Jarrell's formal complaint had not yet been submitted and the disciplinary committee did not consider the merits of Jarrell's claims at the May 30th meeting, the court does not find the dispute as to whether Holert did in fact attempt to contact Dean Davis material. It is clear from the objective record that before the disciplinary committee actually considered the merits of Jarrell's complaint, Holert was represented by counsel. Holert did not seek or rely on assistance from University administrators or faculty during his disciplinary proceedings.

23. On May 30, 1990, Jarrell gave an oral statement before the disciplinary committee. Holert was not permitted to be present during Jarrell's statement.

24. Holert also appeared at the May 30th meeting. Holert told the disciplinary committee that on advice of counsel, he declined to make a statement because of pending criminal proceedings. Arthur Sussman, counsel for the University, instructed the disciplinary committee that they could not draw any adverse inferences from Holert's declination.

25. Wakahiro and Orr appeared at the May 30th meeting. They both claimed that they had had very little contact with Holert during the period at issue.

26. The only decision made by the disciplinary committee at the May 30th meeting was that Jarrell needed to file a formal complaint if she wished to pursue her charges against Holert, Wakahiro and Orr. The committee did not consider the merits of Jarrell's claim at the May 30th meeting.

27. Jarrell filed a formal 14–page complaint on May 30, 1989. Pl.Ex. 21. She alleged that Holert, Wakahiro and Orr engaged in an ongoing pattern of harassment that consisted of:

(1) harassment and threats by Holert;

(2) theft of her credit cards, credit card statements, birth certificate, United Airlines tickets, and other mail from her mailbox, and use of her stolen credit cards and credit card numbers by Wakahiro and Orr; and

(3) a threatening telephone call Holert made to Easton.

Jarrell included a detailed chronology of the alleged harassment beginning in late October 1988, when she had her first clash with Holert over late night noise by Holert and his friends; the ensuing conflicts were mediated by the University's Assistant Director of Student Housing. See Pl.Ex. 5.

28. On May 30, 1989, Dean Martin forwarded a copy of Jarrell's charges to Holert with his own cover letter. Pl.Ex. 18. Dean Martin requested that Holert respond in writing to Jarrell's charges by June 1, 1989, and notified Holert that a hearing would be held on June 2nd, unless Holert needed more time to prepare. Dean Martin invited Holert to call him "... if [he] would like to discuss any aspect of the case." Id. Holert did not contact Dean Martin.

29. By June 1, 1989, Holert retained attorney John Cutrone to represent him in the disciplinary proceedings. On June 1, 1989, Cutrone responded to the charges on Holert's behalf. Pl.Ex. 22. Cutrone explained that because a criminal investigation was being conducted by the United States Postal Inspection Service and the Chicago Police Department concerning the alleged theft of Jarrell's mail and the fraudulent use of her credit cards, he had advised Holert not to testify at the disciplinary hearing on June 2nd. Id.

30. Both Holert and Cutrone attended the June 2nd hearing. Prior to the hearing, a student representative was appointed to the disciplinary committee. At the hearing, Holert read from the Student Information Manual, so that the committee could compare his voice with the voice of the harassing caller on Easton's answering machine.

31. Sometime between June 2 and June 7, 1989, Holert met Dean Martin by chance outside the University gymnasium. Holert and Dean Martin both testified at trial about their conversation; their trial testimony was in substantial conflict. Dean Martin testified that he suggested to Holert that if he were guilty of the charges, he should admit that his conduct was stupid, apologize, and seek forgiveness; but if he were innocent, he should give the committee a voice exemplar and voluntarily produce his telephone records to clear himself. Holert, however, testified that Dean Martin told him that the disciplinary committee was not considering the mail theft charge against him and that he should be cleared of the threatening call to Easton if he turned over his telephone records and provided a voice exemplar.

32. After observing the demeanor of both witnesses, hearing their testimony and considering the extent to which their other testimony is supported or contradicted by the evidence, the court finds Dean

Martin a more credible witness and resolves testimonial conflicts in Martin's favor.[6] There was no credible evidence to suggest Dean Martin misled Holert or prejudiced his case in any way.

33. At the next meeting of the disciplinary committee on July 14, 1989, Jarrell gave an oral statement. Cutrone was present and was permitted to question Jarrell, with the exception of one argumentative question. Holert voluntarily produced his telephone records and was willing to submit to examination by a voice expert. It is undisputed that Holert had the opportunity to present any evidence he wished.

34. On July 14, 1989, the disciplinary committee was furnished a transcript of the criminal case, in which Holert was acquitted of making the threatening telephone call to Easton. Pl.Ex. 63.[7] The disciplinary committee did not consider the transcript because the issues raised in the criminal trial were different than those pending before the committee.

35. The final meeting of the disciplinary committee was held on August 16, 1989. The committee considered two answering machine tapes from Easton's telephone, telephone records of Holert, Orr, Wakahiro and Jarrell, and various documents submitted by all the parties, including Pl.Ex. 8, 9, 11, 21, 22, 30, 31, 32 and 37.

36. The disciplinary committee was unable to identify the screaming voice on the answering machine tape of the allegedly threatening telephone call to Easton. Accordingly, the committee dismissed Easton's complaint against Holert.

37. The disciplinary committee had documentary and physical evidence that Orr and Wakahiro were directly involved in the theft and fraudulent misuse of Jarrell's credit cards. The committee concluded that the nature of the items fraudulently purchased with Jarrell's credit cards, such as a toy train, indicated a motive to harass rather than one of pecuniary gain. The committee reasonably inferred that Orr and Wakahiro did not select Jarrell as a random victim.

38. The disciplinary committee found that the only known connection Orr and Wakahiro had with Jarrell was their friendship with Holert. There was evidence that Orr and Wakahiro were in Holert's apartment during some of his conflicts with Jarrell. See, e.g., Pl.Ex. 5 (letter of William Orr to Martha Koenig, dated January 26, 1989); Pl.Ex. 21, pp. 8–9.

39. The disciplinary committee found that Wakahiro and Orr lied to the committee about their relationship with Holert. Although Wakahiro and Orr claimed that they were estranged from Holert during the period in issue and they had little contact with Holert, their telephone records told a very different story. For example, Holert's telephone records show that between February and May 1989, calls were placed from Holert's telephone to Orr's and Wakahiro's numbers on approximately 40 occasions. Def.Ex. 8A. During the same period, calls were placed from Orr's and Wakahiro's telephones to Holert on approximately 72 occasions. Id. Some of these call were of extended duration, ranging from 10 to 70 minutes. Id. From this evidence, the committee reasonably inferred that Wakahiro and Orr lied about their close relationship with Holert to conceal their involvement in a concerted, ongoing effort to harass Jarrell.

40. The disciplinary committee found that Holert lied in his April 27, 1989 letter to Dean Martin, in which Holert voluntarily asserted that he never contacted Jarrell by telphone and did not even know her telephone number. Pl.Ex. 9. Holert's statement was contradicted by his own tele-

---

**6.** In evaluating Holert's credibility, the court also considers the undisputed fact that in 1990, Holert deceived prospective employers by circulating a resume that falsely represented that he received an M.B.A. with honors from the University of Chicago Graduate School of Business in June 1989. Def.Ex. 2. In fact, Holert used the deceptive resume in securing his present employment as a senior associate in the litigation department of the accounting firm Coopers & Lybrand. Pl.Ex. 73, 75.

**7.** Following a bench trial, the judge was unable to conclude beyond a reasonable doubt that Holert made the telephone call or that the call was inherently threatening. Id. at 92–93.

phone records, which show that three calls were placed from his telephone to Jarrell's number: two calls on April 15, 1989 at 9:21 p.m. and 9:22 p.m.; a third call on April 16, 1989 at 1:44 a.m. Def.Ex. 8A. These telephone contacts took place just days before Holert's letter to Dean Martin. Holert's denial that he contacted Jarrell by telephone was also contradicted by his own attorney, who attempted to explain the three calls from Holert's telephone to Jarrell's number. Pl.Ex. 36. From this evidence, the committee reasonably inferred that Holert affirmatively attempted to mislead them.

41. The disciplinary committee found Jarrell to be a credible witness who had carefully documented her charges against Holert, Orr and Wakahiro.

42. After deliberation, the committee concluded by unanimous consensus that the weight of the credible evidence established that Holert, Wakahiro and Orr engaged in a

> ... systematic, prolonged and premeditated pattern of harassment of Ms. Jarrell. Such acts of harassment included intimidating conduct and phone calls over a period of months and the theft and unauthorized use of Ms. Jarrell's credit cards. Although [Holert] may not have personally engaged in every act of harassment, the Committee concluded that [Holert] and the two other students acted together with the goal of harassing Ms. Jarrell over a lengthy period of time and that [Holert] engaged in inappropriate and unacceptable conduct in pursuit of this goal.

Pl.Ex. 67.

43. The disciplinary committee also concluded that Holert and his accomplices were deserving of expulsion, the most severe sanction available, because

> [Holert's] misconduct and that of the other two students was extremely serious and destructive. As stated in the 1988–89 *Student Information Manual* (p. 28), harassment of another student—particularly when as prolonged and systematic as that engaged in here—is a grave offense against the victim and the Univer-

sity community. The Committee determined that this premeditated pattern of harassment disrupted Ms. Jarrell's personal and academic life. The harassment was also detrimental and destructive to the [Graduate School of Business] and the broader university community.

*Id.*

44. Holert unsuccessfully appealed the disciplinary committee's decision to a University review board with the assistance of his father, who is a practicing attorney in California. One of the arguments Holert asserted on appeal was that the punishment was too harsh. Final Pretrial Order, Ex. A, ¶ 63. Holert does not challenge the review board's procedures.

45. Here, Holert contends that (1) the University's decision to expel him "... was arbitrary and capricous (sic) and in bad faith" and, (2) the University failed to follow its own procedures in expelling him. *Id.*, Ex. B–1 (Agreed Statement of Contested Issues of Fact and Law).

## CONCLUSIONS OF LAW

1. The court has diversity jurisdiction over this dispute pursuant to 28 U.S.C. § 1332; venue is appropriate in this district under 28 U.S.C. § 1391(a).

■ 2. Under Illinois law, a university and its students have a contractual relationship; the terms of their contract are generally set forth in the university's catalogs and manuals. *Wilson v. Illinois Benedictine College*, 112 Ill.App.3d 932, 68 Ill.Dec. 257, 262, 445 N.E.2d 901, 906 (2d Dist.1983); *Eisele v. Ayers*, 63 Ill.App.3d 1039, 21 Ill.Dec. 86, 91, 381 N.E.2d 21, 26 (1st Dist.1978).

3. Holert had a contractual obligation to the University under the *Student Information Manual* not to harass or inflict personal abuse on another student.

■ 4. Holert must establish that the disciplinary committee's determination that he engaged in a pattern of abusive and harassing conduct was made arbitrarily, capriciously and in bad faith, in order to prevail on his breach of contract claim against the University. *Illinois Benedic-*

tine College, supra; Aronson v. North Park College, 94 Ill.App.3d 211, 49 Ill.Dec. 756, 762, 418 N.E.2d 776, 782 (1st Dist. 1981), app. denied, 119 Ill.2d 553, 119 Ill. Dec. 381, 522 N.E.2d 1240 (1988).

5. The disciplinary committee's decision is arbitrary and capricious only if it is without any discernable rational basis. Courts have adopted this deferential standard because of a reluctance to interfere with the academic affairs and regulation of student conduct in a private university. People ex rel. Tinkoff v. Northwestern University, 333 Ill.App. 224, 231, 77 N.E.2d 345, 349 (1st Dist.1947), cert. denied, 335 U.S. 829, 69 S.Ct. 37, 93 L.Ed. 383 (1948).

6. A private university may prescribe the moral, ethical and academic standards that its students must observe; it is not the court's function to decide whether student misbehavior should be punished or to select the appropriate punishment for transgressions of an educational institution's ethical or academic standards. Donaldson v. Board of Education for Danville School District No. 118, 98 Ill.App.3d 438, 53 Ill.Dec. 946, 947–48, 424 N.E.2d 737, 738–39 (4th Dist.1981).

7. The evidence produced at trial established that the disciplinary committee's determination that Holert engaged in a "systematic, prolonged and premeditated pattern of harassment" was rationally based on evidence and credibility determinations.

8. Even if this court were to adopt the less deferential standard Holert now advocates,[8] there is substantial evidence in the record to support the disciplinary committee's decision.

9. The committee acted within its discretion in deciding to impose the sanction of expulsion, given the evidence of a prolonged, premeditated and concerted course of action that resulted in the disruption of another student's personal and academic life.

10. Holert offered no credible evidence that the disciplinary committee was biased or acted in bad faith. In a university setting, prior contact among the faculty and students is likely; that fact alone does not indicate bias or partiality. Gorman v. University of Rhode Island, 837 F.2d 7, 15 (1st Cir.1988). The disciplinary committee, which included a student representative, is entitled to a presumption of honesty and integrity, absent a showing of actual bias, such as animosity, prejudice or a personal or financial stake in the outcome. Ikpeazu v. University of Nebraska, 775 F.2d 250, 254 (8th Cir.1985).

11. Because the relationship between Holert and the University was strictly contractual in nature, Holert was entitled only to those procedural safeguards that the University agreed to provide. The evidence produced at trial adequately established that the disciplinary committee conducted its proceedings in substantial compliance with University standards and the established practices of the Graduate School of Business. There is no evidence that the disciplinary committee failed to afford Holert the procedural safeguards available to any disciplined student in the Graduate School of Business or that he was prejudiced in any way by variations between the University's standards and the practices of the Graduate School of Business.

12. Holert did not produce any credible evidence to support his assertion that the faculty members of the disciplinary committee were biased or prejudiced toward him either because of their remote and casual contacts with Jarrell's brother or because Easton, Jarrell's boyfriend, was a professor in the Graduate School of Business. Indeed, the fact that the disciplinary committee dismissed Easton's complaint against Holert, as unsubstantiated by adequate evidence, supports a conclusion that the committee conducted itself in a fair and impartial manner.

13. Holert has failed to establish by a preponderance of the credible evidence that

---

8. In his proposed conclusions of law, however, Holert relies on the same cases and governing principles as the University. See, e.g., Holert's proposed conclusions of law, ¶¶ 3, 5, 6.

the University breached its contractual obligations to him. To the contrary, the evidence established that Holert failed to conduct himself in accordance with the ethical standards that were a condition of his acceptance into the University's M.B.A. degree program.

### ORDER

Judgment is entered for defendant University of Chicago and against plaintiff Patrick Holert.