**In re JOINT EASTERN AND SOUTH-
ERN DISTRICTS ASBESTOS
LITIGATION.**

This Document Relates to: Schiefer, Hen-
ry, 87 Civ. 3459, Legaz, George, 87 Civ.
3460, Zink, Albert, 87 Civ. 3515, Soika,
Joseph, 87 Civ. 3532, Ford, William, 87
Civ. 3571, Postler, Roy, 87 Civ. 3572,
Grispo, Joseph, 87 Civ. 4577, Lever,
John, 88 Civ. 4851, Coseglia, Barbato,
88 Civ. 4852, Bonvicino, Paul, 88 Civ.
4853, Sinnott, James, 88 Civ. 4854,
Doyle, Walter, 88 Civ. 4855, DiChiara,
Salvatore, 88 Civ. 4856, Cuviello, Louis,
88 Civ. 4857, Ryan, Daniel, 88 Civ. 4858,
Market, Joseph, 88 Civ. 4859, Pace, Do-
minic, 88 Civ. 4860, Ferguson, Stanley,
88 Civ. 4861, Earle, George, 88 Civ. 4862,
Vodopia, Nick, 88 Civ. 4863, Vukovich,
Paul, 88 Civ. 4864, Sussman, Sam, 88
Civ. 4865.

No. 87 Civ. 3459 (RPP).

United States District Court,
E. and S.D. New York.

April 19, 1991.

Perry Weitz, P.C., New York City by Donald I. Marlin, Charles Ferguson, for plaintiffs.

Heidell, Pittoni, Murphy & Bach, New York City by Bruce F. Gilpatrick, for defendant Anchor Packing.

Hinckley & Silbert, New York City by James Silbert, Michael Sena, for defendant Owens–Corning Fiberglas Corp.

McCarter & English, Newark, N.J. by Mark Weissmann, Rosanne Kemmet, for defendant Owens–Illinois.

Gordon & Silber, New York City by Michael Yoeli, for Manville Trust.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

Plaintiffs move, pursuant to Rule 59 of the Federal Rules of Civil Procedure, for a new trial on the ground that the jury's verdict was against the weight of the evidence.[1]

The plaintiffs argue (1) that the jury concluded that defendants did not know or should not have known of the hazards of asbestos at the time of plaintiffs' exposures from the late 1930's to the 1960's, and (2) that the evidence to the contrary was so compelling as to be overwhelming. Plaintiffs' Memorandum in Support of Motion for New Trial ("Plaintiffs' Mem.") at 1.

Plaintiffs argue that the issue determined by the jury is thus so similar to the verdict denying the plaintiffs relief in *Kulzer v. Owens–Corning Fiberglas Corp.*, No. 87 Civ. 0386, 1990 WL 294374 (W.D. N.Y. July 5, 1990) that the Court should follow Judge Telesca's example and grant plaintiffs' motion for a new trial as against the weight of the evidence. The Court concludes that the jury, in all probability, did determine a closely analogous question, namely that the plaintiffs had failed to prove each of the defendants had or should have had knowledge at the time of plaintiffs' exposure of the dangers of their respective asbestos-containing products sufficient to give rise to a duty to warn the plaintiffs.

Plaintiffs' analogy may be an over-simplification. It proceeds on the assumption that plaintiffs' "state of the art" evidence presented in *Kulzer* and in this case was virtually the same and hence that the issues of fact presented to the jury as to each defendant were the same. Because of that possibility and the Court's regard for Judge Telesca's acumen it has reviewed the exhibits and testimony cited by plaintiffs on this motion in detail.[2]

Throughout the trial, the defendants acknowledged that for a number of years prior to 1938, and certainly as a result of the Meriwether Report published in Great Britain in 1930, it was known that excessive exposure to asbestos, particularly raw asbestos, could be harmful and could cause pulmonary fibrosis, commonly called "asbestosis." In general, defendants' line of proof was that in that era medical science in its then-existing state addressed the issue, as it had with other lung diseases such as tuberculosis and silicosis, by endeavoring to determine at what dust levels asbestos could be used safely; that a safe dust level was arrived at in a U.S. Public Health Service study; that, in the light of that study, the defendants proceeded to market products which contained lesser amounts of asbestos, conducted periodic physical examinations of their employees, investigated subsequent claims of asbestos injury in a responsible fashion and tested the effects of their asbestos-containing products utilizing particularly the existing science laboratories at Saranac Lake, New York.

In the manufacturing process, where higher levels of exposure to asbestos dust

---

**1.** On oral argument plaintiffs conceded that the motion did not apply to defendants Anchor Packing or Celotex (which has now filed for bankruptcy), the cases brought on behalf of plaintiffs Bonvicino, Cuviello, Ford and Earle, as to whom the jury found no asbestos-related injury, the cases of Lever and Sussman dismissed by the Court at the close of plaintiffs' case for failure of *prima facie* proof or the case of DiChiara which was voluntarily discontinued.

**2.** The Court notes that it took nine weeks to present the evidence in this case whereas the *Kulzer* trial lasted only ten days.

took place, there was evidence that masks and other precautionary measures were utilized.[3] At no time, however, until the mid–1960's were warnings of any kind placed on the marketed insulation products of any of the defendants and it was exposure to these end products that plaintiffs, who worked where insulating products were installed, testified to being exposed.

A factor complicating the manner in which defendants determined their duty to warn customers was the nature of asbestosis, the disease caused by asbestos exposure. The medical evidence presented by plaintiffs was that the disease had a latency period and manifested itself after 20 or 30 years (the latency period being longer at lower exposure levels) and that the effects of exposure to asbestos were cumulative. This medical evidence was not disputed.

The state of the art (or scientific knowledge) evidence offered by defendants was founded on a highly authoritative study on the dangers of asbestos conducted by Dr. Dreesen, an assistant Surgeon General of the United States, published by the U.S. Public Health Service in 1938. The Dreesen study, a report of over 100 pages and containing an extensive bibliography, concluded that if dust concentration in asbestos factories could be kept below 5,000,000 (5 million) particles per cubic foot of air, new cases of asbestosis probably would not appear.[4] This standard became known as the threshold limit value ("TLV"). In the 1940's state industrial health codes in New York, New Jersey, Pennsylvania and Ohio, progressive states, adopted the Dreesen TLV as safe exposure to asbestos. Defendants also relied on recommendations promulgated by the American Conference of Governmental Industrial Hygienists in 1946 and annually thereafter which reaffirmed the Dreesen TLV of 5 million particles of dust per cubic foot of air.[5] In the 1950's the United States Navy adopted the same standard. Defendants maintained that the dust levels in insulation work areas were believed to be considerably lower than in asbestos manufacturing facilities and factories and that the few tests taken confirmed that they were below the TLV.[6]

The issues are further complicated by the war effort in which the Navy proceeded to use asbestos because of its fire resistant qualities in massive amounts throughout its warships and other ocean-going vessels, thus greatly expanding asbestos use and the degree of exposure in Navy Yards. A study by Fleischer–Drinker[7] published in 1946 on the effect of heavy asbestos use on insulation workers in the Brooklyn Navy Yard showed minimal harmful effects had been demonstrated—only three out of 1074 workers had contracted asbestosis and those three had pre–1938 TLV exposure.[8] This study does not appear to have, fully considered the lengthy latency period involved in asbestos exposure. It also suffered from the difficulty of determining

3. There was testimony that, at least during part of the period prior to mid–1966, masks were furnished to workers on job sites but that the masks were uncomfortable and generally discarded by the workers.

4. The Dreesen Report was based in part on studies of asbestos exposure in textile mills, not in projects in the insulation field such as were involved in this case.

5. At least two other later studies provided further confirmation of the Dreesen TLV. In 1953 Doctors Isselbacher, Klaus and Hardy found that experience had led to the acceptance of 5 million particles per cubic foot as a safe working concentration, Tr. 4748–49, and in 1968 Doctors Balzer and Cooper of the School of Public Health, University of California at Berkeley, found no incidence of asbestosis occurring below the 5 million particle level. Tr. 4760.

6. For instance, a study by Keane and Zavon found "clear-cut cases" of asbestosis for prolonged exposure to concentrations in excess of 5 million particles per cubic foot but no cases at lower concentrations. Keane and Zavon noted that the 5 million particle standard was recommended as tolerable without qualification as to the length of the individual asbestosis fibers. Tr. 4757. There was some scientific belief that only long asbestosis fibers represented a danger.

The various studies of work conditions for insulators were on average about 5 million particles per cubic foot of air. Tr. 4761.

7. Drinker was a professor at the Harvard School of Public Health.

8. Defendants' expert maintained that this study showed that dust levels at Navy Yard installations were on average within the TLV although there were higher dust levels on occasion.

whether pre–1938 exposure or post–1938 exposure was a cause of those few asbestosis cases reported, and by a lack of adequate knowledge of the exact dust levels maintained in the Navy Yard. Nevertheless the study was considered authoritative.

After World War II there was wider use of asbestos as insulation for boilers in power plants and in the construction of office buildings in the New York area. The evidence showed all the plaintiffs whose cases went to verdict were exposed to asbestos in the insulation field, either at the Brooklyn Navy Yard or in construction. The jury found all but four had contracted an asbestos-related condition or disease (asbestosis or cancer including mesothelioma).

During this period the evidence showed that certain officials of defendants, notably Mr. Vandiver Brown, general counsel of Johns Manville and Dr. Kenneth Smith, also of Johns Manville, were concerned that the TLV might not have been a safe level of exposure. In 1947 the Hemeon Report was released to certain manufacturers in the asbestos industry. It called into question the TLV for asbestos noting that a new scientific measuring device showed that former dust measurements of 5 million asbestos particles per cubic foot actually contained a much higher number of asbestos particles. Accordingly, it suggested that a reexamination of safe levels of exposure for asbestos be undertaken.[9]

In their argument that the jury's verdict was against the weight of the evidence plaintiffs principally rely on certain statements made in the defendants own documents.

1. Owens–Corning Fiberglas Corporation ("OCF")

Plaintiffs rely particularly on OCF documents to show that Edward Ames of OCF knew that asbestos was hazardous and caused disease in the early 1940's. Indeed OCF documents (OCF 9–10) show that in 1942 Ames proposed and OCF considered instituting an asbestos danger informational program among insulation workers in order to ensure worker acceptance and use of OCF's fiberglass materials. This campaign was proposed 16 years before OCF became a manufacturer of asbestos-containing insulation itself. There was evidence that in 1958 Owens–Illinois ordered delivery to OCF of copies of Owens–Illinois' Saranac study of Kaylo, the asbestos-containing product whose manufacture OCF took over from Owens–Illinois at that time, to demonstrate that OCF should have been aware in 1958 of the hazardous nature of asbestos-containing insulation materials (OCF 42). Internal OCF memoranda (OCF 50–56) show knowledge that asbestos could cause fibrosis and that in 1956 members of the asbestos workers locals were being found to have lung cloudiness and that one member was believed to have died from asbestosis. Plaintiffs also rely on OCF's monitoring the asbestos insulator's union efforts through Dr. Irving Selikoff in 1965 to study and gather information concerning asbestosis (OCF 60).[10] Lastly, plaintiffs claim that evidence demonstrating a link between asbestos and lung cancer was furnished to OCF by the Saranac Group in 1956: "asbestos (as found in Kaylo) when breathed into the lungs causes asbestosis which often leads to lung cancer." (OCF 407, 63).[11]

9. This study did not show that Dreesen's TLV was wrong but merely that Dr. Dreesen's equipment did not discern the correct number of particles of asbestos in his dust samples. It remained to be shown whether the previously indiscernible dust particles increased the dangerousness of the asbestos-containing products of the defendants. The theory that short asbestos fibers were not dangerous was still believed by some scientists. P 2051.

10. Dr. Selikoff's 1965 report was the landmark study finding a direct and conclusive link be-

tween pulmonary fibrosis (asbestosis) and asbestos exposure of insulation workers. Dr. Selikoff concluded that the TLV of 5 million particles per cubic foot was probably too low and that the latency period for asbestosis was longer than had been previously thought.

11. There was also testimony that in a 1955 report for the National Cancer Institute, Dr. Hueper found that asbestosis was associated with an increased incidence of lung cancer. Tr. 4753–54.

Furthermore an OCF official repeatedly urged the company to place warnings on its product from 1964 on, yet it did not do so until December 28, 1966. (OCF 64, 65, 70, 72, 73, 76).

In summary, plaintiffs decry OCF's reliance on the TLV, stating OCF knew that insulators were getting sick as early as the 1950's, and thus knew either the asbestos insulators were being exposed above the TLV level or that the TLV was wrong.

Defendant OCF takes the position that the uncontested evidence shows that OCF began distributing asbestos-containing Kaylo in 1953 and manufacturing it in 1958. Before that time, OCF manufactured glass insulation products which OCF workers objected to handling. OCF claims that the Ames memoranda at most were a proposed attack on asbestos products to counter workers' rejection of the glass insulation products by pointing out the potential dangers of the alternative of using asbestos products. OCF further contends (citing Ames' proposed utilization of 1938 bibliography materials) that the Ames memoranda were at most aimed at publicizing the Dreesen Report and its lengthy bibliography without reference to its recommendations and were not aimed at products like Kaylo, which was thereafter distributed in the form of pressed asbestos-containing block or pipe insulation pieces; that the Ames memoranda appeared 16 years before OCF undertook asbestos-related activities and that the TLV had been adopted in response to the Dreesen Report, thus making the Ames materials irrelevant.

In addition OCF claims plaintiffs misconstrue OCF 63, noting that the statement "asbestos (as found in Kaylo) when breathed into the lungs causes asbestosis which often leads to lung cancer" was merely the title of a proposed finding which conclusion the document then goes on to state available medical evidence did not support; that the Saranac Lake documents (Tr. 1276–79, 1293–97) did not find the use of Kaylo by humans to be unsafe but only that it "should be handled industrially as a hazardous substance" and that even factory dust levels in the Owens–Illinois (subsequently OCF) factory in Berlin, New Jersey were found to be below the legal and recommended level of the TLV and that industrial hygienists believed use at the job sites was at lower levels and within the TLV (e.g., the Fleischer–Drinker study). OCF points out that Dr. Selikoff's report was first published in December 31, 1965 and that it acknowledged that there had been no large scale epidemiological studies of insulation workers in the United States between the 1946 Fleischer–Drinker study and Dr. Selikoff's study in 1965 and that the purpose of the Selikoff study was to determine "whether asbestos exposure during insulation in the U.S. was associated with the hazard of asbestosis and its complications." OCF argued that it believed its patented Kaylo product to be safer than other asbestos-containing products, that it first learned that an insulator exposed to Kaylo had become ill in October 1966 (OCF 70) and that it, within a reasonable time shortly thereafter, it placed its warning on Kaylo (Tr. 2320).

OCF argued (Tr. 1276–79, 1293–97, 1278) that the testimony of Willis Hazard, the former industrial hygienist at Owens–Illinois and an official with the U.S. Public Health Service from 1942 to 1946, taken by deposition in 1981, showed that the Saranac Lake studies did not call for a warning on Kaylo by Owens–Illinois; that the high degree of intensity of exposure of the test animals in those asbestos studies did not lead it to conclude humans exposed to far lower intensities of exposure were in danger; that testing of workers showed an absence of disease caused by breathing of dust even after a good many years in Owens–Illinois' (later OCF's) Kaylo plants at Sayreville and Berlin, New Jersey, and "that Saranac had conducted testing of workers at the plants with negative results and had never advised [OCF] that any worker in its plants had contracted asbestosis."

## 2. Owens–Illinois

Plaintiffs' evidence (OI 6) as to Owens–Illinois is more related to Owens–Illinois' own scientific efforts to determine the safety of its asbestos-containing product Kaylo

prior to introducing it. Owens–Illinois' documents show it knew it was dealing with a hazardous material, asbestos, and was told to treat its Kaylo product as potentially hazardous in order to protect its plant workers. Owens–Illinois' Saranac studies showed asbestosis was produced in every test animal exposed after a latency period of 30–36 months and it was warned to minimize the exposure of its workers. Owens–Illinois had asked Saranac to evaluate hazards of Kaylo from the point of view of factory workers making the product and users installing or applying the product. It was told "we are not certain just what atmospheric concentrations of asbestos fibers is the limit of safety." This, plaintiffs contend, was adequate reason for the jury to find that Owens–Illinois should have placed warnings on its Kaylo product.

Defendant Owens–Illinois responds that plaintiffs distort the record citing only the generalized information that exposure in excess of the TLV of 5 million particles per cubic foot might cause ill effects and ignoring the overwhelming evidence introduced at trial that at the time Owens–Illinois was manufacturing Kaylo (1945–58), everyone who had studied the issue including the government and the medical and scientific communities believed that exposure at levels at or below the TLV of 5 million particles per cubic foot would not cause any harmful effects and that the universal belief was codified in statutes of several states including New York, New Jersey, Pennsylvania and Ohio. (Tr. 4717–19, 4722, 4729, 4735, 4744, 4757, 4760, 4765, 4770, 1276–78, 1297, 4736).

Owens–Illinois claims plaintiffs mischaracterize the Hazard testimony and Saranac documents. It argues that the high-level exposure, 125 million particles of asbestos per cubic foot of air, to which test animals were exposed undercut the findings of harmful effects because such high exposures were always claimed to be dangerous. It stresses that the conclusions of the scientists of the Trudeau Institute as Saranac Lake was that no harmful effects would result from low levels of exposure.

Owens–Illinois emphasized that before first marketing its asbestos-containing insulation and blocks of Kaylo (it did not manufacture asbestos-containing cement) in 1942 it initiated a lengthy scientific study at Saranac Lake and it stopped manufacture and sale of Kaylo in 1958. Owens–Illinois stresses that their former employee Hazard testified that the Saranac Laboratory concluded that as long as the TLV was adhered to Kaylo did not pose a health risk. (Tr. 1276–74). It points to the fact that the annual TLV for exposure to asbestos particles published by *American Industrial Hygiene Journal* was 5 million particles from 1946–1963 (Tr. 4736–37) and that the American Conference of Governmental Industrial Hygienists (physicians, industrial hygienists and scientists employed by state and local agencies) accepted the 5 million particle TLV annually from 1946–1968, ten years after Owens–Illinois ceased manufacturing asbestos-containing products.

Owens–Illinois' evidence was that no complaints regarding its Kaylo plant workers were received by Owens–Illinois; that of 1000 x-rays of such employees none had confirmed lung damage as a result of asbestos exposure (Tr. 1273–74, 1296); that Owens–Illinois was never advised by Trudeau Laboratories that the TLV was unreliable (Tr. 1297) or that shipyard workers or industrial workers using Kaylo were at risk or that a warning should be placed on its asbestos-containing product. (Tr. 1297–98).

Owens–Illinois offered the expert opinion of Dr. Joseph Cimino, former Commissioner of Health of New York City, supplementing the testimony of the expert called on behalf of all defendants, Dr. Gerald Kerby, about the state of medical and scientific knowledge concerning asbestos exposure, to the effect that based on the nonpublic information and conclusions about the Saranac Lake experiments contained in the Owens–Illinois Saranac Lake documents and his knowledge of the published medical and scientific literature existing at the time, there was *no reason for* Owens–Illinois to believe that end users of their product such as insulators would be

at risk for asbestosis or asbestos-related disease.[12]

### 3. Johns Manville (JM)

Plaintiffs state of the art proof against Johns Manville (JM) consisted of its knowledge of lawsuits initiated in the 1920's and 1930's by workers involving alleged injuries (stipulation Tr. 4110) and knowledge of asbestos disease developing in insulators with low-level exposure in the 1930's, 1940's and 1950's as well as in people who lived in the vicinity of its Canadian mine where raw asbestos was produced.

In one study conducted for JM at Saranac Lake the test animals developed lung cancer but JM officers persuaded Saranac not to publish the result. Dr. Kenneth Smith, former Manville medical director, testified by deposition taken in June 1976 that he began to advise JM officials to include a health warning on its asbestos product in the early 1950's but that management did not respond to his recommendation. Tr. 4047–48, 4110–4112. JM received a copy of the Hemeon Report in 1947 which recommended tests to develop a new yardstick for the asbestos exposure. Finally JM admitted it had knowledge of the potential link between asbestos and lung cancer in 1943. (Tr. 4110).

JM, a third-party defendant in most of these cases, acknowledged that there had been claims of asbestos injury filed in the 1930's, 40's and 50's, but argued that these claims which supposedly put the manufacturer on notice of the hazards of asbestos-containing products in the insulation field were filed for persons working in asbestos manufacturing facilities who were thus exposed to raw asbestos (Tr. 6518–19) as opposed to a person using the end product; that the claims also involved persons who had been working with asbestos many years earlier, before the TLV had been adopted; and that only a handful of claims out of thousands of such people had been filed on behalf of persons who did use the end product and were by persons who had worked with the product when concepts of dust control were in their infancy. JM attacked the competency of plaintiffs' state of the art witness, a non-medical witness who testified to his evaluation medical literature, and pointed out his bias, particularly his allegedly misplaced reliance on the Vandiver Brown paper and the Hemeon Report. JM explained the comments of Vandiver Brown, General Counsel of JM, as not saying the TLV was too high but as raising questions from a responsible management perspective. Manville made a similar analysis of the Hemeon Report as merely raising a question about the TLV but not finding that the concept was in fact inappropriate. Tr. 6223.

## DISCUSSION

### 1. Motion for New Trial

■ Plaintiffs' motion for a new trial was made as of October 19, 1990, almost 60 days after the entry of judgments in this consolidated case, and considerably more than the 10–day period permitted by Rule 59(b) of the Federal Rules of Civil Procedure. However, at the time of the verdict the Court in view of the nine-week duration of the trial and time pressures on counsel for plaintiffs in connection with other asbestos litigation granted plaintiffs a lengthy time to make this motion. Accordingly, the Court deems the motion timely and has given plaintiffs' weight of the evidence argument extensive consideration. *See Agola v. Hagner*, 678 F.Supp. 988 (E.D.N.Y.1987) (applying equitable exception to allow consideration of motion for new trial filed past 10–day limit where plaintiffs misinterpreted court's grant of request "to extend time for filing of all motions").

■ In considering a motion for a new trial under Rule 59(a) the Court has "wide discretion." Wright & Miller, § 2531 at 575. *See also Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct.

---

**12.** Lastly, Owens–Illinois argues that plaintiffs and other workers continued to expose themselves to asbestos, even while they were being evaluated by Dr. Selikoff for possible asbestos-related disease and while they were reading articles in the *Asbestos Worker Magazine* about high-level asbestos exposure and disease, and thus received adequate warning.

188, 190–91, 66 L.Ed.2d 193 (1980) (per curiam). In New York, a district court "should not grant a new trial unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Smith v. Lightning Bolt Prod., Inc.*, 861 F.2d 363, 370 (2d Cir.1988) (denying new trial); *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir.1978) (quoting Wright & Miller). Put another way, the Court may grant a motion for new trial even where the verdict is supported by substantial evidence where the Court finds that the verdict is contrary to the weight of the evidence. *See Arkwright–Boston Mfrs. Mut. Ins. Co. v. Calvert Fire Ins. Co.*, 695 F.Supp. 156, 160 (S.D.N.Y.1988) (holding verdict was not against weight of evidence), *aff'd*, 887 F.2d 437 (2d Cir.1989). The court may weigh the evidence itself and may consider issues of credibility. The Second Circuit has held that the reviewing court need not view the evidence in the light most favorable to the verdict winner, *see Bevevino*, 574 F.2d at 684, although at least one lower court disagrees. *See Brink's Inc. v. City of New York*, 546 F.Supp. 403 (S.D.N.Y.1982) (Weinfeld, J.).

■ The Court's review of the evidence leads it to the conclusion that the jury's verdict, returned after three and one-half days of deliberations, should not be disturbed. This conclusion is based on the following considerations:

1. The jury, when presented with state of the art evidence, was asked to determine the state of scientific knowledge and the reasonableness of a defendant's actions in light of such knowledge in a period from 25 to 50 years prior to trial. The Court is not prepared to substitute its judgment on those issues for that of the jury.

2. The defendants' position was that (a) it was known that asbestos could cause pulmonary fibrosis (asbestosis) in the 1920's and 1930's; (b) science and medicine believed that proper control of the level of dust and periodic examination of workers would result in no further asbestosis; and (c) it was reasonable for defendants to rely on the TLV set forth in the 1938 Dreesen Report as industrial groups, the Navy and various state legislatures had done, and to rely on the 1946 Fleischer–Drinker study.

After a review of all the evidence the Court is inclined to the view that the jury viewed the evidence in much the same way as Dr. Selikoff in his article in 1973 and determined as he did that industry and labor shared in ignorance and neglect of the asbestos-related health problems among insulators and that science and medicine were at fault for giving inadequate attention to environmental and occupational health studies. The Court does not find this view to be against the weight of the evidence. Accordingly plaintiffs' motion for a new trial is denied. A fortiori the motion for judgment notwithstanding the verdict is denied.

**2. The Jury Charge**

■ The Court has reviewed plaintiffs' counsel's position that the Court erred by giving the substance of plaintiffs requests to charge on the duty of the manufacturer to test its product but not adopting the exact wording of plaintiffs' request. The Court does not believe that the charge varies in substance from plaintiffs' request. As given orally it included a duty to test. There was no exception by plaintiffs after the charge. In the Court's judgment, the court in *George v. Celotex Corp.*, 914 F.2d 26 (2d Cir.1990) was not suggesting that an unqualified charge of a "duty to test fully and inspect" their "products to uncover all dangers that are scientifically discoverable" was the only proper charge. As the Court explained at oral argument products in use and already tested such as salt or soap, a content of which can be very harmful in small or in large quantities, do not under all circumstances require manufacturer tests to uncover all dangers that are scientifically discoverable.

The pertinent part of Court's charge, a copy of which was in the jury's possession throughout its deliberations, was delivered as follows:

> Before placing a novel or inherently dangerous product on the market a manufacturer is under a duty to investigate and adequately test that product to deter-

mine whether it is harmful for its intended and foreseeable use. The manufacturer also must keep abreast of knowledge affecting its products while they are on the market as gained by research and scientific literature.

If a manufacturer or distributor knows or should know a product is dangerous, the manufacturer or distributor must take such steps as are reasonably necessary to bring a potential hazard which it knew about or should have known about at the time it is marketing its product to the attention of the foreseeable users of the product. The greater the known potential hazard of the product, the more extensive must be the manufacturer's efforts to make that hazard known to people who foreseeably might be exposed to that product, so that they might take steps to protect themselves or choose to avoid exposure.

It is not necessary for a defendant to foresee the precise nature of an injury sustained by a plaintiff. It is sufficient that the defendant knew or should have known that injury could result from exposure to one of its products.

A manufacturer's or distributor's duty to warn, however, is only to those persons whom it could reasonably foresee or which it should have foreseen would be exposed to the products and only for injuries which it either actually knew about, or about which it reasonably should have known, might be caused to those persons during the intended or reasonably foreseeable use of the products. "Should have known" means, as I have told you, that a manufacturer or distributor is held to that level of knowledge which experts had, and the level of knowledge which was available to or could have been obtained by an expert in view of the state of medical and scientific research and literature during the period of plaintiff's exposure to a particular defendant's product.

If a reasonable expert would have concluded that a defendant's asbestos-containing product's potential for producing injury posed a serious risk of harm, or that a large number of people might be endangered, then the defendant has a greater duty to investigate and test the effects of its product. Under that circumstance, a defendant is charged with the knowledge and information, if any, that would have been revealed had it conducted a more thorough investigation within the parameters of scientific feasibility of the time and is liable for its failure to take adequate steps to warn of the potential nature of the harm in that event.

Now once a manufacturer or distributor has placed a warning on its product it is not absolved of liability to a plaintiff. The warning must be sufficiently conspicuous to come to the attention of the user. Its language must be adequate to inform the user of the nature of the danger involved, the seriousness of the danger, and instruct him how to avoid that danger. The existence of and sufficiency of other types of warnings given to users of a product is also something you should consider in judging the adequacy of the warning. However, a manufacturer or distributor may not rely solely on its warnings to third parties as giving sufficient warning to the users of a product it knew or should have known was harmful.

If you find that a defendant failed to warn or give adequate warnings of the danger of its products that it knew or should have known about at the time it marketed those products, then you will find that defendant liable if you determine that the plaintiff was exposed to that product and that such exposure, if any, and the failure to warn adequately was a proximate cause of injury to the plaintiff. On the other hand, if you find that a defendant gave adequate warnings to the users of all the dangers it knew or should have known about, then you will find that defendant not to be liable for failure to warn for exposures occurring after the adequate warnings were given.

The Court is of the opinion this charge is consistent with the prevailing law in New York and that counsel for the plaintiffs did

not alert the Court to any objection it may have had to the finalized version.

IT IS SO ORDERED.