Kevin **ROONEY**, Plaintiff,

v.

Michael Gerard **TYSON**, Defendant.

No. 89–CV–166.

United States District Court,
N.D. New York.

Feb. 18, 1997.

Office of Michael J. Coyle, New York City, for Plaintiff; Michael J. Coyle, of counsel.

Sidley & Austin, New York City, for Defendant; James D. Arden, Robert W. Hirth, Julie A. Torrey, of counsel.

## MEMORANDUM–DECISION AND ORDER

McAVOY, Chief Judge.

Before the Court are four post-trial motions in the above-captioned matter. Defendant Michael Gerard Tyson moves for judgment as a matter of law, or, in the alternative, for a new trial pursuant to Fed. R.Civ.P. 50(a) and (b). Plaintiff Kevin Rooney moves to amend the judgment pursuant to Fed.R.Civ.P. 59(e), and for a new trial on the issue of damages.

## I. BACKGROUND

This action arose out of the alleged breach, by defendant, of an employment contract between he and plaintiff. Plaintiff's cause of action came on for trial on September 17, 1995. Defendant moved for judgment as a matter of law both at the close of plaintiff's evidence and at the close of all evidence: the Court reserved on both motions. The jury retired at 3:40 p.m. on September 26, 1996, and rendered a verdict in favor of plaintiff on Monday, September 30, 1996.

### A. Defendant's Motion for Judgment as a Matter of Law:

Defendant raises various arguments in support of his motion for judgment as a matter of law. These arguments address plaintiff's alleged failure to introduce evidence sufficient to sustain the jury verdict with respect to: (1) the existence of a contract made by Cus D'Amato on defendant's behalf; (2) the existence of a contract made by Jim Jacobs on defendant's behalf; and (3) the duration of the contract as found by the

jury. Defendants also argue (4) that the evidence demonstrated that the boxer-trainer relationship is a close, confidential relationship.

### 1. The Standard for Judgment as a Matter of Law:

The Second Circuit has established the standard for granting a judgment as a matter of law. The court in *Mattivi v. South African Marine Corp., "Huguenot"*, 618 F.2d 163 (2d Cir.1980), stated that:

> the trial court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury. Rather, after viewing the evidence in a light most favorable to the non-moving party (giving the non-movant the benefit of all reasonable inferences), the trial court should grant a judgment n.o.v. only when (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.

*Id.* at 167–68; *see Samuels v. Air Transport Local 504,* 992 F.2d 12, 14 (2d Cir.1993); *Mallis v. Bankers Trust Co.,* 717 F.2d 683, 688–89 (2d Cir.1983).[1] Rule 50 of the Federal Rules of Civil Procedure governs the procedure for granting judgment as a matter of law by motion made before the jury retires pursuant to Rule 50(a), or motion after the jury has spoken pursuant to Rule 50(b). Fed.R.Civ.P. 50; *see Samuels,* 992 F.2d at 14.

### 2. The Contract's Alleged Duration is Indefinite as a Matter of Law:

 Defendant argues that the alleged term of the contract—"for as long as Tyson fights professionally"—does not constitute a fixed duration as a matter of law.

The general rule in New York is that employment is "at will," terminable at any time by either party. *Wright v. Cayan,* 817 F.2d 999, 1002 (2d Cir.), *cert. denied,* 484 U.S. 853, 108 S.Ct. 157, 98 L.Ed.2d 112 (1987); *Sabetay v. Sterling Drug, Inc.,* 69 N.Y.2d 329, 514 N.Y.S.2d 209, 211, 506 N.E.2d 919, 920–21 (1987); *Murphy v. American Home Products,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 237, 448 N.E.2d 86, 90–91 (1983). This rule, however, is only a rebuttable presumption, *Weiner v. McGraw–Hill, Inc.,* 57 N.Y.2d 458, 457 N.Y.S.2d 193, 198, 443 N.E.2d 441, 446–47 (1982), and can be "trumped" in two ways. First, " 'if the employer made a promise, either express or implied ... that the employment should continue for a period of time that is either definite or capable of being determined, that employment is not terminable by him at will.' " *Weiner,* 457 N.Y.S.2d at 197, 443 N.E.2d at 445 (quoting 1A Corbin, Contracts, § 152 at 14). Second, even if the employment contract is of an indefinite duration, courts will give effect to an *express* limitation on the employer's right to discharge. *Murphy,* 461 N.Y.S.2d at 237, 448 N.E.2d at 90–91.

Plaintiff in this case relied upon the first of these exceptions, arguing that D'Amato's promise that Rooney would train defendant for "as long as Tyson boxed professionally" stated a definite term as a matter of law, thus limiting defendant's right to discharge plaintiff. On defendant's motion for summary judgment, the trial judge from whom this case was transferred, the late Hon. Con. G. Cholakis, held that

> where termination is possible upon the occurrence of a specified event, a contract does not fail for indefiniteness simply because the contingent event may not occur. In this case, the specified contingency is the ending of Tyson's professional boxing career, an event certain to occur, although not specifically determinable. A trier of fact certainly could determine that such a contract was not terminable at will.

---

1. While the 1991 amendments to Rule 50 abandoned the terms "directed verdict" and "judgment not withstanding the verdict" in favor of the encompassing "judgment as a matter of law" terminology, the standard for granting the motions was not altered. *See* Fed.R.Civ.P. 50 Advisory Committee's note, 1991 Amendment.

*Rooney v. Tyson,* No. 89–CV–166, Order Dated Oct. 18, 1994 at 6–7. At trial, the Court submitted the question of the employment's duration to the jury on a special verdict form.[2] The jury found that the contract was of a definite duration.

■ This Court now holds that the alleged term of the employment contract, "for as long as Tyson boxes professionally," does not state a term of definite duration as a matter of law, and thus defendant's motion under Fed.R.Civ.P. 50(a) must be granted.

■ It is well-settled that under New York law, terms such as "permanent employment", "until retirement" or "long term" do not state a definite term of employment as a matter of law. *See, e.g., Wright v. Cayan,* 817 F.2d 999, 1003 (2d Cir.1987) (letters from employer promising "permanent employment" failed to rebut at-will presumption); *Peters v. MCI Telecommunications Corp.,* 685 F.Supp. 411, 414 (S.D.N.Y.1988) (employer's promise that employee " 'could expect long term employment' " failed to state definite duration); *Hunnewell v. Manufacturers Hanover Trust Co.,* 628 F.Supp. 759, 762 (S.D.N.Y.1986) (promise that employee's tenure was through "full working life" or "through normal retirement age" stated indefinite term). The evidence adduced by plaintiff at trial showed that the alleged term of employment here was "for as long as Tyson fought professionally." (R. 22, 140). The Court sees no reason to depart from the import of these cases that such a term is indefinite as a matter of law.

The district court in *Weiler v. National Multiple Sclerosis Society,* 1980 WL 104 (E.D.N.Y.1980), was faced with an analogous scenario. In *Weiler,* the plaintiff brought a breach of contract action under New York law based upon an oral employment contract. *Id.* at *3. He alleged that defendant had promised him that once he completed a probationary period, plaintiff could work "until he chose to retire." *Id.* In dismissing the claim, Judge Motley held that

> [t]he alleged oral employment contract, providing that plaintiff could work "until he chose to retire," is without doubt, a contract for an indefinite period of time. No specific time period for the contract is alleged by plaintiff ... *In fact, the very phrase, "until he chose to retire," is indicative of the indefinite time period of the contract.*

*Weiler,* 1980 WL 104 at *3 (emphasis added).

The temporal point of reference concededly is somewhat reversed in the present case; i.e., rather than a promise of employment for the length of the employee's career, the term was measured by the length of the employer's (Tyson's) career. Plaintiff here was essentially promised employment until *Tyson* chose to retire. This distinction, however, serves only to underscore the equivocal nature of the alleged term: an employee's expectation of employment obviously will be even less certain when based upon the contingency of his employer's retirement, rather than his own, and particularly when his employer is a professional boxer. Tyson's testimony that he "fights[s] one fight at a time," (R. 720)[3] bears out such a scenario, as does Rooney's own testimony that at the time he became Tyson's trainer, he had no idea how long Tyson's career would last. (R. 140).

■ Not only is the term of employment itself indefinite, but the nature of the proof offered at trial cannot sustain a finding that the employment relationship was anything other than one at-will. The basis of plaintiff's belief that his contract was for the length of Tyson's career was D'Amato's and Jimmy Jacobs' oral statements to that effect. (R. 22, 140, Pl.Ex. 22). However, "[o]ral assurances of lifetime employment, or a suggestion that an employee would be fired only for cause, without more, are insufficient to support a claim for breach of employment contract under New York law." *Wanamaker*

---

**2.** The question asked: "Do you find that plaintiff Kevin Rooney has proved, by a preponderance of the evidence, that the employment contract was of a definite duration?"

**3.** In response to a question regarding how much longer he would fight, Tyson stated: "I have seven more fights—four more fights with this network I would like to finish that up. And who knows how I'll feel after that. I just got to do one fight at a time basically." (R. 720).

*v. Columbian Rope Co.,* 907 F.Supp. 522, 538 (N.D.N.Y.1995); *see also Romer v. Board of Trustees of Hobart and William Smith Colleges,* 842 F.Supp. 703, 709 (W.D.N.Y.1994) (employer's oral assurances of job security by themselves not sufficient to create express agreement); *Cucchi v. New York City Off-Track Betting Corp.,* 818 F.Supp. 647, 652 (S.D.N.Y.1993) ("an employer's oral assurances that induce a person to work for the employer are not by themselves sufficient evidence of an express agreement to alter the employee's at-will status"); *Kotick v. Desai,* 123 A.D.2d 744, 507 N.Y.S.2d 217, 219 (2d Dep't 1986) (oral agreement that promised "permanent position to last as long as the plaintiff was physically capable" insufficient to overcome at-will presumption). The jury in this case was so charged. (R. 1419).

■ Moreover, while the jury was required to examine the totality of the circumstances in determining whether plaintiff had overcome the presumption of at-will employment, *Weiner,* 457 N.Y.S.2d at 198, 443 N.E.2d at 446–47, plaintiff presented no evidence, other than a variety of "oral assurances," indicating employment for a fixed term. As such, the jury's conclusion that the alleged contract was of a definite duration is entirely unsupported by the evidence presented.

The cases previously relied upon by plaintiff do not merit a different result. *Wanamaker v. Columbian Rope Co.,* 740 F.Supp. 127 (N.D.N.Y.1990), did not address the question of whether a definite duration was stated in an employment contract; rather, the question presented was whether an oral promise of career-long employment, terminable only for cause, fell within New York's Statute of Frauds. *Id.* at 136–37. When the question of the duration of the same contract in the same case arose five years later, Judge McCurn held that such oral assurances do not trump the presumption of at-will employment. *Wanamaker v. Columbian Rope Co.,* 907 F.Supp. 522, 538 (N.D.N.Y.1995).

*Jones v. Dunkirk Radiator Corp.,* 21 F.3d 18 (2d Cir.1994), is inapposite as well. In that case, the plaintiff, a third party, and the corporate defendant entered into a joint venture agreement which provided, as a temporary interim structure, that plaintiff would be a salaried employee of defendant. *Id.* at 19. Since the corporate defendant was in the best position to take advantage of the initial losses for tax purposes, plaintiff was to remain an employee until the venture generated annual sales of $1.8 million, at which point the venture would become a partnership. *Id.* After its initial investment of $150,000, defendant was free to abandon the venture at any time. *Id.* at 21. Before the annual sales achieved the $1.8 million threshold, and before abandoning the venture, defendant terminated plaintiff's employment. *Id.* at 20.

The Second Circuit, in reversing the district court's grant of summary judgment to defendant on plaintiff's breach of employment contract claim, held that "a reasonable trier of fact could find that the [agreement] constituted an employment contract of an ascertainable term measured by either achievement of the $1.8 million threshold ... or Dunkirk's decision to abandon the project any time after expending the $150,000 required under the agreement." *Jones,* 21 F.3d at 22. In reaching this conclusion, however, the Court noted that the employment relationship clearly was *intended* to be nothing more than a temporary interim structure, and that plaintiff gave up steady employment to pursue the venture in reliance on defendant's commitment. *Id.* In *Jones,* then, "the totality of the circumstances, including the writings, the situation, the course of conduct of the parties and their objectives" arguably gave rise to a reasonable inference that the employment was not at will. *Weiner,* 457 N.Y.S.2d at 198, 443 N.E.2d at 446–47. The case thus is distinguishable on its facts.

In summary, because the alleged term of the employment contract is indefinite as a matter of law, defendant's motion under Fed. R.Civ.P. 50(a) is granted.

## B. Defendant's Motion For a New Trial:

Defendant moves in the alternative for a new trial pursuant to Fed.R.Civ.P. 50(b) and 59(a). Under Fed.R.Civ.P. 50(c)(1),

[i]f the renewed motion for judgment as a matter of law is granted, the court shall

also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for the new trial. In case the motion for a new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment.

*Id.; see also Banff, Ltd. v. Express, Inc.,* 921 F.Supp. 1065, 1066 n. 1 (S.D.N.Y.1995). The Court thus turns to defendant's motion for a new trial.

## 1. The Standard Under Rule 59:

■■■ A less stringent standard applies to a motion to set aside the verdict and for a new trial pursuant to Rule 59(a). "A trial court should grant such a motion when convinced that the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice." *Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 970 (2d Cir. 1987); *see Newmont Mines Ltd. v. Hanover Ins. Co.,* 784 F.2d 127, 132 (2d Cir.1986). Furthermore, the Court may weigh conflicting evidence and need not view such evidence in the light most favorable to the nonmoving party. *See Song v. Ives Laboratories, Inc.,* 957 F.2d 1041, 1047 (2d Cir.1992); *Iannone v. Frederic R. Harris, Inc.,* 941 F.Supp. 403, 409 (S.D.N.Y.1996). A trial judges's disagreement with the jury's verdict alone, however, is insufficient reason to grant the motion for a new trial. *Mallis,* 717 F.2d at 691; *see Saloomey v. Jeppesen & Co.,* 707 F.2d 671, 679 (2d Cir.1983).

It is in light of this standard that the Court examines defendant's motion for a new trial.

## 2. The Standard Applied:

Defendant moves for a new trial on the grounds that: (1) the verdict was against the weight of the evidence; (2) the Court improperly excluded evidence; (3) the Court failed to properly instruct the jury; (4) the admission of hearsay was prejudicial; and (5) the jury's findings were inconsistent. The Court will address these arguments *seriatim.*

### (a) Verdict Against the Weight of the Evidence

Defendant first argues that the verdict was against the weight of the evidence as to D'Amato and Jacobs' actual practices, D'Amato's view of Rooney's position, and material inconsistencies in Rooney's testimony.

■■■ Conflicting evidence was presented on these three issues, and this Court cannot say that the jury's findings were against the weight of such evidence. "[T]he grant of a new trial on weight of the evidence grounds should be reserved for those occasions where the jury's verdict was egregious." *Dunlap–McCuller v. Riese Organization,* 980 F.2d 153, 158 (2d Cir.1992), *cert. denied,* 510 U.S. 908, 114 S.Ct. 290, 126 L.Ed.2d 239 (1993). Moreover, defendant's arguments in this regard turn largely upon the credibility of the witnesses. While this Court *may* consider defendant's motion for a new trial based upon such grounds, a jury's evaluation of the witnesses' credibility should not lightly be disturbed. *Id.; see also Metromedia Co. v. Fugazy,* 983 F.2d 350, 363 (2d Cir.1992), *cert. denied,* 508 U.S. 952, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993); *In re Joint Eastern & Southern Districts Asbestos Litigation,* 762 F.Supp. 519, 526 (E.D.N.Y.1991).

*D'Amato and Jacobs' Actual Practices:* Rooney testified that he entered into the agreement on the words and handshakes of D'Amato and Jacobs. (R. 21–22, 36, 127, 139). Plaintiff also submitted evidence that Jacobs noted in an interview that Rooney would be Tyson's trainer as long as Tyson was a professional boxer. (R. 44; Pl.Ex. 22). Furthermore, plaintiff's witness Craig Jaufman testified that "Cus [D'Amato] told me that everything was done by a handshake and your word," (R. 232); William Cayton testified that he usually dealt with D'Amato with a handshake. (R. 431). On the other hand, Jay Bright testified for defendant that D'Amato did not make long-term verbal agreements with fighters, (R. 1121); other testimony indicated that the contracts involving Tyson, Jacobs and Cayton were all in writing. (R. 79–81, 445, 461, 475, 502). From such conflicting assertions, the jury was free to reject the contention that D'Amato would never have entered an oral contract.

*D'Amato's View of Rooney:* Defendant also argues that the testimony of Jay Bright, Matt Baranski, Tom Patti and Camille Ewald to the effect that D'Amato was going to fire Rooney compels the inference that D'Amato did not enter a long-term contract with Rooney for Tyson's training. (*See* R. 807–08, 912–13, 1120–22). In evaluating such testimony, however, the jury alternatively could either have discredited such testimony, or drawn a different inference: namely, that D'Amato wanted to fire Rooney despite the existence of the contract. The Court cannot say that such conclusions were against the weight of the evidence.

*Rooney's Inconsistencies:* As to allegations of material inconsistencies in Rooney's testimony, the jury was properly instructed on *falsus in uno,* and thus was permitted to discredit all or part of Rooney's testimony, as they were permitted with each witness.

*Rooney's Alleged Disloyalty:* Finally, the Court cannot conclude that the evidence overwhelmingly established at trial that Rooney's conduct justified his discharge. Defendant's characterization that Rooney's testimony regarding Cayton's honesty (Def. Ex. 46; R. 193) amounted to Rooney "publicly siding with Cayton" is just that: a characterization, and one that the jury was in no way required to buy into.

Defendant simply assumes that his witnesses had to be believed, and further assumes that specific inferences had to be drawn in his favor. This Court does not agree that the evidence compelled such conclusions, nor does it agree that the jury's findings were against the weight of the evidence on these four issues. Therefore, defendant's motion for a new trial cannot be granted on these grounds.

### (b) Exclusion of the Boxer–Manager Contracts

Defendant next argues that the Court improperly excluded from evidence the NYSAC contracts executed by Tyson and Jacobs or Cayton, and that such exclusion was prejudicial.

By the Court's count, this is at least the sixth time this issue has been addressed. The origin of this Nietzschian dilemma, in which the parties and the Court are faced with this eternal return to the same arguments *ad infinitum,* is a stipulation of the parties so ordered by Judge Cholakis on October 18, 1990. That stipulation provided that the defendant waived, with prejudice, the argument that "[t]he alleged agreement in the Amended Complaint violates the rules of—*and is contrary to agreements approved by*—the New York State Athletic Commission and is void and unenforceable as against the public policy of the State of New York." (Emphasis added). After two attempts to circumvent this stipulation were thwarted by Judge Cholakis (*see* Orders dated January 2, 1996; December 16, 1994), this Court ruled on August 24, 1996 that, as held by Judge Cholakis, the "waiver applie[d] to all aspects of the 'agreement' in this case as they relate to the NYSAC rules ...".

Nonetheless, Tyson disclosed prior to trial several summary exhibits comprising his boxer-manager contracts with Jacobs and Cayton. These contracts, as defendant's counsel conceded at oral argument on the August 24 motion *in limine,* essentially tracked the provisions of the NYSAC rules, and in fact referred to the rules; such provisions were blown up and highlighted in the exhibits. This Court ruled the exhibits inadmissible, as they essentially were nothing more than a summary of the NYSAC rules, covered as such by the 1990 stipulation.

At trial, defendant attempted to use the NYSAC contracts to impeach Cayton's testimony to the effect that Cayton viewed D'Amato's statement that Rooney would be Tyson's trainer as a statement "which [he] felt was in force." (R. 481). In support of such impeachment, defendant pointed to the provision in the NYSAC contracts certifying that there were no oral or written agreements concerning the training of Tyson. Thus, defendant essentially was arguing that the alleged oral agreement was "*contrary to agreements approved by* ... the New York State Athletic Commission," the precise argument waived in the 1990 stipulation.[4] Whether by

---

4. Defendant blatantly and selectively mischarac- terizes the 1990 stipulation as merely having

impeachment or direct evidence, the Court ruled that such use of the contracts was foreclosed by the stipulation. The Court will not now depart from that ruling.

### (c) Jury Instructions

Defendant argues that the Court's refusal to instruct the jury on the following three issues requires a new trial: (1) the requirement of express authority where a contract is extraordinary and unusual; (2) the requirement of a writing to avoid the at-will rule; and (3) that durational terms for permanent or career employment are too indefinite to be enforced.

As to (1), the Court stated at trial that the requirement of express authority where a contract is extraordinary or unusual specifically applies in a corporate or organizational context. While defendant asserts that there is no such language in the relevant cases, the Second Circuit has explained the rationale:

> Alleged contracts of life employment are, however, so unusual as to have been, with rare exceptions, condemned by the courts as unreasonable and unauthorized. The president or other executive officer of a corporation has no authority as such to make a contract that one should remain in the corporate employ for life even under a general power "to appoint, remove and fix the compensation of employees."
>
> *The New York rule thus stated was adopted so that the hands of future corporate officers would not be tied or their actions unreasonably hampered by such an employment commitment.*

*Burke v. Bevona,* 866 F.2d 532, 536–37 (2d Cir.1989) (emphasis added) (internal quotations and citations omitted). The Court in *Burke* expanded upon this rationale in the context of labor organizations, noting that "the ability of an elected union president to select his own administrators is an integral part of ensuring a union administration's responsiveness to the mandate of the union election." *Id.* at 537.

Furthermore, this Court's charge on agency as a whole adequately stated the law. "Only if the trial judge's instructions to the jury, taken as a whole, give a misleading impression or inadequate understanding of the law and the issues to be resolved, is a new trial required." *Bass v. Int'l Broth. of Boilermakers,* 630 F.2d 1058, 1062 (5th Cir. 1980). Given the context in which the express authority rule has been applied, this Court does not find that failing to instruct the jury in this regard rendered its agency instruction inadequate.

With respect to the requirement of a writing to avoid the presumption of at-will employment, the Court in fact charged the jury that "[w]hile agreements can be formed on the basis of oral statements, oral assurances of continued employment alone do not serve to create a contract of definite duration." (R. 1419). In accordance with *Weiner v. McGraw–Hill,* 57 N.Y.2d 458, 457 N.Y.S.2d 193, 443 N.E.2d 441 (1982), the Court additionally charged that "[i]n determining whether the parties intended the relationship to be at will or for a definite duration, you must look to the totality of the circumstances, *including any writings which may exist,* oral negotiations, the nature of the employment, the course of conduct of the parties and their objectives." (R. 1419) (emphasis added); *see Weiner,* 457 N.Y.S.2d at 198, 443 N.E.2d at 446–47 (in determining whether presumption of at-will employment is overcome by definite term, trier of fact must consider course of conduct, writings and antecedent negotiations).

Furthermore, it is unclear that such a writing is required. *Compare Kosson v. Algaze,* 84 N.Y.2d 1019, 622 N.Y.S.2d 674, 675, 646 N.E.2d 1101, 1102 (1995) ("Plaintiff had to submit evidentiary facts that he was employed by defendant for a fixed duration pursuant to a definite written contract of employment") *with Ingle v. Glamore Motor Sales, Inc.,* 73 N.Y.2d 183, 538 N.Y.S.2d 771, 773, 535 N.E.2d 1311, 1313 (1989) (plaintiff "did not sufficiently present facts raising a triable issue regarding the existence of *either*

---

withdrawn the affirmative defense that the agreement was "void and unenforceable against the public policy of New York." As the most cursory examination of the Stipulation reveals, however,

defenses based upon the NYSAC rules, and agreements approved by the NYSAC are foreclosed as well.

*an oral or written employment contract* fixing employment of a definite duration") (emphasis added). Given the uncertain state of the law, and the Court's charge in conformity with *Weiner,* defendant is not entitled to a new trial on this issue.

In light of the reasoning with respect to the Court's grant of judgment as a matter of law to defendant, however, a new trial is warranted on the Court's failure to charge, as defendant requested, that

> Durational terms such as "full working life," "through normal retirement age," "career position," "permanent position," and "a job for the balance of one's career" do not state a fixed duration.

(Def. Request to Charge at 79). If, on appeal, the Circuit finds that an issue of fact exists as to whether the purported contract is for a definite duration, then defendant would be entitled to the above charge because the evidence supports a finding that the term was indefinite under applicable law. *See* 9 C. Wright & A. Miller, Federal Practice and Procedure § 2556 (1971) ("As against a more general or abstract charge, a party is entitled to a specific instruction on his theory of the case, if there is evidence to support it and if a proper request for such an instruction has been made.").

### (d) The Jury's Findings

Lastly,[5] defendant argues that the jury's findings regarding a "definite duration" and damages indicate that the contract found was for a duration ending June of 1991, and thus cannot be sustained. This argument rests upon a clear misunderstanding of the jury's findings.

In determining whether the jury's answers to the interrogatories are consistent, the Court must " 'adopt a view of the case, if there is one, that resolves any seeming inconsistency.' " *Auwood v. Harry Brandt Booking Office, Inc.,* 850 F.2d 884, 890 (2d Cir. 1988) (quoting *Fiacco v. City of Rensselaer,* 783 F.2d 319, 325 (2d Cir.1986), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698

(1987)). In this case, the jury awarded plaintiff damages of $4,415,651.00. This amount corresponds roughly with 10% of Tyson's stipulated earnings ($44,156,521.00) in his first seven fights following the date of the breach, beginning with the Frank Bruno bout on February 25, 1989, and ending with the Donovan Ruddock bout on June 28, 1991.

Rather than interpret this finding, as does defendant, to indicate that the jury found a contract for an otherwise unsubstantiated duration through 1991, the Court can provide another, more rational explanation. First, we will assume that the jury found that the contract was for the only duration alleged by plaintiff, namely, "for as long as Tyson boxes professionally;" no proof of any other duration was offered. Second, two instructions given by the Court to the jury come into play:

> The measure of damages for an employee who had been wrongfully discharged is ... the amount of the compensation that would have been payable under the contract from the date of discharge to the date of termination of the contract ...

(R. 1422).

> *Such damages must be proved with reasonable certainty.* In determining the amount of future damages, if any, that Mr. Rooney has sustained, you may not rely on guesswork or speculation as to events not reasonably likely to take place.

(R. 1423) (emphasis added).

Third, we must look to the evidence presented at trial. Of particular note are stipulated facts 73, 75, 77, 79, 82, 84 and 86. These facts stipulate the amounts of Tyson's proceeds for his first seven fights following the breach. These proceeds consisted of Tyson's gross purse minus payment of some, but not all, of his expenses, specifically certain training expenses. The jury thus clearly found that these amounts, not being in dispute, formed a sufficient basis for calculating at least some of plaintiff's damages with reasonable certainty.

---

**5.** Defendant also argues that because there was no evidence that either D'Amato or Jacobs was actually authorized to enter into the alleged contract, "hearsay statements by D'Amato or Jacobs

should not have been admitted." However, defendant offers no legal or factual support for this argument; thus, defendant's motion for a new trial is denied on this ground.

The same cannot be said for the remaining amounts. With respect to the $50 million attributed to Tyson's Showtime and MGM bonuses, the jury was free to reject plaintiff's claim that he was entitled to 10% of this amount; the record taken as a whole does not compel the conclusion that such amounts were boxing earnings, nor did plaintiff present any evidence that the contract itself called for Rooney to receive 10% of *any* amounts earned by Tyson. During cross examination by defendant's counsel, plaintiff admitted that, as he had asserted in a sworn affidavit, his agreement with defendant was that he was to receive 10% of the net proceeds from *"each boxing match."* (R. 156).

With respect to Tyson's earnings from the McNeely, Mathis, Bruno II and Seldon bouts, such amounts were *not* stipulated. Those amounts, as asserted by plaintiff, were clearly Tyson's *gross* purses, as is reflected in the bout contracts themselves. (See Pl. Ex. 139, 140, 158, 160). Thus, the rational explanation for the finding as to damages is that the jury determined that plaintiff was entitled to 10% of defendant's *net* purses, which had been calculated with reasonable certainty as to the first seven post-breach bouts via stipulation. The jury obviously determined that plaintiff was not entitled to a percentage of the bonuses, and that, the net purses of the remaining bouts not having been proved or stipulated, the damages as to those purses could not be calculated with reasonable certainty.[6] Finally, the jury clearly found that future damages were too speculative, and thus awarded none. This is not only a more rational explanation than that proffered by defendant, it is the only explanation supported by the evidence.

For all of these reasons, then, the jury's verdict was neither inconsistent nor the result of a compromise. Defendant would thus not be entitled to a new trial on these grounds.

---

**6.** This conclusion is supported by the variation in percentage difference between Tyson's gross and net purses in the seven stipulated bouts: Bruno I, 7.7%; Williams, 10.2%; Tillman, 0.9%; Stewart, 11.0%; Douglas, 6.7%; Ruddock I, 4.3%;

## III. CONCLUSION

For all the foregoing reasons, defendant's Rule 50 motion for judgment as a matter of law is GRANTED. In the event such judgment is vacated on appeal, the Court hereby conditionally GRANTS defendant's motion for a new trial for the reason stated above. Plaintiff's motions for a new trial on the issue of damages, and to amend the judgment, are hereby DENIED as moot.

IT IS SO ORDERED.

Ruddock II, 1.8%. This inconsistency reflects the difficulty the jury would have had in extrapolating from the stipulated purses a net purse amount in the remaining bouts.