Frank E. ROMER, Plaintiff,

v.

BOARD OF TRUSTEES OF HOBART & WILLIAM SMITH COLLEGES and Hobart & William Smith Colleges, Defendants.

No. 93–CV–6231L.

United States District Court, W.D. New York.

Jan. 14, 1994.

Susan T. Johns, East Syracuse, NY, for plaintiff.

Anthony R. Palermo, Rochester, NY, for defendants.

## DECISION AND ORDER

LARIMER, District Judge.

Plaintiff, Frank E. Romer, is a former classics professor at defendant Hobart & William Smith Colleges ("the Colleges"). He has sued the Colleges and the Colleges' Board of Trustees ("the Board"), alleging that he was denied tenure in 1990 based upon an improper tenure review process. Romer asserts causes of action for breach of contract, estoppel, and intentional infliction of emotional distress. He seeks damages totaling one million dollars and an order directing defendants to reevaluate him for tenure. Jurisdiction is premised on diversity of citizenship under 28 U.S.C. § 1332(a)(1).

Defendants move to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b) and 12(c). In the alternative, defendants move for summary judgment under Fed.R.Civ.P. 56.

. Both sides have submitted extensive materials outside the pleadings, and a full understanding of the case requires reference to some of those materials, particularly certain documents relating to the tenure review process. I will therefore treat the motion as one for summary judgment under Fed.R.Civ.P. 56.[1]

### BACKGROUND

#### I. Tenure Review Procedure

Plaintiff accepted appointment to a tenure-track position at the Colleges in 1986, and began teaching in 1987. He had no formal, written employment contract expressly denominated as such, but the nature of the agreement was reflected in correspondence between Romer and Minor Myers, Jr., who was then the Provost and Dean of Faculty of the Colleges. See Answer to Complaint, Ex. 1–3.

When he accepted the position, Romer received a copy of the Faculty Handbook ("Handbook"), which contained the Bylaws of

---

1. In this regard, I note plaintiff's argument that further discovery is needed as to the contract claim. Many of the materials submitted thus far deal with the procedure for tenure review generally. The discovery which plaintiff proposes to conduct relates to the manner in which his particular review was conducted. As explained in the following discussion, however, even if plaintiff's factual allegations concerning his tenure review are true, his claims cannot stand. The lack of discovery is therefore no impediment to the disposition of defendants' motion.

the Faculty ("Bylaws") and "Guidelines for Review II (tenure)" ("Guidelines"). These documents set forth the procedure and criteria for deciding whether to grant tenure to a teacher. *See* Answer to Complaint Ex. 4.

Section III of the Bylaws provides that successive reviews of a candidate for tenure are to be made by the Departmental Committee from the candidate's department, an Individual Committee which checks the Departmental Committee's report for completeness, and the Committee on Tenure and Promotion ("COTAP"). After reviewing the file and the Departmental Committee's report, COTAP makes its own recommendation to the President of the Colleges. This recommendation is deemed to be the faculty's recommendation on the case. Bylaws, p. 4. Based on a review of COTAP's recommendation, the President decides whether to submit the candidate's name to the Board of Trustees, which has the final authority to grant tenure.

The Bylaws enumerate the general criteria upon which the recommendations of the Departmental Committee and COTAP are to be based, namely: "1) continuing professional competence as a teacher, 2) noteworthy service to the College community or curriculum, [and] 3) scholarly and professional contributions." *Id.* The Bylaws elaborate at some length concerning the type of matters that should be considered under the general criteria. *See* Bylaws p. 5–8.

The Guidelines also list the criteria which COTAP should consider in making its recommendation. Again, these are divided into three categories: teaching, scholarly and professional work, and community service. The Guidelines set forth both evidence and the types of qualities that are considered relevant to each category. Guidelines p. 8–11. Quoting from the Bylaws, the Guidelines add that "[t]he weighing of a person's several contributions to the College community cannot be accomplished entirely by rule but certain guidelines should systematically be invoked." Guidelines p. 12.

## II. Plaintiff's Tenure Review

Romer was considered for tenure in the 1989–90 academic year. The Departmental Committee, which undertook the first review, issued reports on November 20, 1989 and February 20, 1990, recommending that Romer be granted tenure.[2] Complaint Ex. C.

COTAP then began its review, during which it met with Rebecca Fox, Dean of the Colleges. She expressed certain concerns about Romer, which she memorialized at COTAP's request in a letter to COTAP dated March 12, 1990. Complaint Ex. D.

Dean Fox's letter dealt mostly with what she called the "extremely volatile relationship" between Romer and another classics professor, Paula Sage. Plaintiff alleges that at one time he and Sage had a personal relationship, which he contends ended prior to his and Sage's employment at the Colleges. Complaint ¶ 12. Whatever their relationship may have been in the past, however, by the time of Romer's tenure review, that relationship had become decidedly unpleasant.

In her letter, Dean Fox related that a particular student who was serving on the tenure review committees for both Romer and Sage had made a "complete retreat" from her classics studies because of the strain she felt due to "the public enmity between her two teachers ..." Complaint Ex. D. Fox added "as a private, personal opinion ... not to be taken as 'advice' on a tenure decision," that she found it "highly problematic for faculty members not to be able to keep their private difficulties contained," and that "[t]he highly public nature of Professor Romer's and Sage's problems with one another ... is highly debilitating in terms of their relationships—both singly and as a department—to the community." Fox concluded that "[w]hat bearing all of this has on the processes of review for tenure and renewal of contract is for you [*i.e.,* COTAP] to decide." *Id.*

COTAP forwarded Dean Fox's letter to the Departmental Committee for its com-

---

**2.** The second report was issued after the Individual Committee had found certain procedural de- ficiencies in the original report.

ments. On April 16, 1990, the Departmental Committee issued an addendum to its previous report, stating that it declined to discuss the letter because "the Dean's letter contains no information relevant to a tenure decision as described in our bylaws," and that the problems between Romer and Sage, "while unfortunate, do not involve teaching, scholarship, or community service." Complaint Ex. F.

On May 17, 1990, COTAP issued its recommendation to the President, stating that four of its six members (the other two abstained) "f[ou]nd Professor Romer's candidacy deficient in teaching, scholarship, and community service," and that they did not recommend tenure. Complaint Ex. G. The report did not elaborate on the basis for the finding.

In a letter dated May 22, 1990, the President of the Colleges advised plaintiff that he would not recommend plaintiff for tenure to the Board. Complaint Ex. H. A copy of COTAP's report accompanied the letter. On June 3, 1990, the Acting Provost and Dean of Faculty notified Romer that his contract would be allowed to expire at the end of the 1990–91 academic year. *See* Answer Ex. 5.

Romer filed a grievance with the Colleges' Grievance Committee, which consists of seven faculty members who are elected each spring for a one-year term.[3] Any individual teacher may request that the Grievance Committee review any decision adversely affecting the teacher's status if the teacher believes the decision to have been made with inadequate or improper consideration. A three-member panel examines the case and issues a recommendation.

In his grievance, Romer listed forty-six specific complaints relating to his denial of tenure and matters concerning Paula Sage.

On November 5, 1990, the Grievance Committee issued a report rejecting Romer's grievances. The report rejected Romer's request that his tenure application be reconsidered. The Grievance Committee found that COTAP did not consider improper or irrelevant information, that COTAP had carefully

and fairly considered the evidence, and that COTAP's decision was reasonable based on the information before it. Complaint Ex. J.

Romer then wrote to the Chairman of the Executive Council of the Board, requesting a hearing before the Board and a review of his tenure candidacy. In a letter dated March 11, 1991, the Executive Council denied his request, stating that it saw no reason to interfere with the normal grievance procedures that he had already pursued.

Romer filed the complaint in this action, over two years later, on May 20, 1993, naming the Board and the Colleges as defendants. The complaint contains three causes of action. The first is for breach of contract. Romer alleges that the terms of the Handbook regarding tenure created a "contract" between him and the Colleges, which the Colleges breached by failing to follow the procedures set forth in the Handbook, and by considering improper information during Romer's tenure review.

The second cause of action is based on a theory of equitable estoppel. Romer alleges that in accepting and continuing employment at the Colleges, he relied upon the procedures in the Handbook concerning tenure, and that the Colleges should be estopped from deviating from that procedure.

The third cause of action is for intentional infliction of emotional distress.

### DISCUSSION

Defendants move to dismiss the complaint on several grounds. First, they move to dismiss as to the Board, or in the alternative, to quash the return of service of the summons and complaint on the ground of insufficient service of process on the Board. Second, they move to dismiss the first cause of action as time-barred. Third, they move to dismiss the complaint for failure to state a claim. Fourth, they move to dismiss the complaint for failure to meet the $50,000 jurisdictional threshold in diversity cases.

---

3. Defendants have submitted a copy of the grievance to the court. To protect the privacy of the persons named in the grievance, however, the parties have agreed that it should not be made a part of the file.

## I. Breach of Contract

Defendants contend that although the first cause of action is styled as a breach of contract claim, it is, or should be pleaded as, a claim under C.P.L.R. Article 78. Defendants argue that this claim is therefore barred by the four-month statute of limitations applicable to Article 78 claims.

■■■ Article 78 provides a vehicle for judicial review of governmental action "previously obtained by writs of certiorari to review, mandamus or prohibition ..." C.P.L.R. § 7801. The scope of Article 78 encompasses review of some actions of private colleges. "[H]aving accepted a state charter and being subject to the broad policy-making jurisdiction of the Regents of the University of the State of New York, ... private colleges and universities are accountable in a CPLR Article 78 proceeding ... for the proper discharge of their self-imposed as well as statutory obligations." *Gertler v. Goodgold,* 107 A.D.2d 481, 486, 487 N.Y.S.2d 565 (1st Dep't), *aff'd,* 66 N.Y.2d 946, 498 N.Y.S.2d 779, 489 N.E.2d 748 (1985); *see also Karlen v. New York Univ.,* 1980 WL 240, 24 Empl.Prac.Dec. ¶ 31,272 (S.D.N.Y.1980).

Therefore, in some circumstances, a denial of tenure may be the subject of an Article 78 proceeding. "The principle has long been established that an Article 78 proceeding is the appropriate method for presenting a claim that denial of tenure resulted from a violation of rights conferred by the constitution or statute, 'or was arbitrary and capricious or an abuse of discretion.'" *Pauk v. Board of Trustees of City University of New York,* 111 A.D.2d 17, 488 N.Y.S.2d 685 (1st Dep't 1985), *aff'd,* 68 N.Y.2d 702, 506 N.Y.S.2d 308, 497 N.E.2d 675 (1986).

At the same time, however, Article 78 is not the exclusive remedy for all relief sought against a college. A cause of action based on a contract may be brought (and sometimes can *only* be brought) in an action at law rather than in an Article 78 proceeding. *See*

*Golomb v. Board of Ed. of City Sch. Dist. of City of New York,* 92 A.D.2d 256, 460 N.Y.S.2d 805 (2d Dep't 1983); *Karlen,* 1980 WL 240, 24 Empl.Prac.Dec. ¶ 31,272.

An important question in the instant case, therefore, is whether plaintiff has truly stated a contract claim, or whether he is seeking the type of judicial review of defendants' actions which should more appropriately be pursued in an Article 78 proceeding.

■■■ The gist of plaintiff's first cause of action is that defendants owed him certain contractual obligations by virtue of the tenure review procedures set forth in the Handbook. Plaintiff also asserts that he was given oral assurances from the provost of the Colleges that defendants would abide by those procedures.

There is an extensive line of New York cases dealing with the issue of when bylaws, employee handbooks, and the like can give rise to contractual duties. The first principle to be gleaned from these cases is that the "mere existence of a policy manual or an internal grievance procedure is insufficient" to create a contractual limitation on the employer's rights with respect to termination of an employee. *Porras v. Montefiore Med. Ctr.,* 185 A.D.2d 784, 7876, 588 N.Y.S.2d 135 (1st Dep't 1992), *app. denied,* 81 N.Y.2d 704, 595 N.Y.S.2d 399, 611 N.E.2d 300 (1993).[4] There must instead be "an express limitation on the employer's right of discharge ..." *Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 305, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983). In the absence of such a limitation, a contractual duty will not be implied. *Sabetay v. Sterling Drug, Inc.,* 69 N.Y.2d 329, 336, 514 N.Y.S.2d 209, 506 N.E.2d 919 (1987).

The New York Court of Appeals has identified four circumstances from which a contractual limitation may be inferred: (1) the plaintiff was induced to leave other employment by the defendant's assurances of job security; (2) these assurances were incorpo-

---

4. *Porras,* like many of the cases discussed herein, involved an at-will employee, whereas in the case at bar, Romer had a renewable contract for a definite term of employment. Nonetheless, the holdings of the at-will cases are pertinent to the instant case, since in either situation the employ-

ee is attempting to assert contractual rights based on some document which is not on its face a formal employment contract. *See, e.g., De Simone v. Skidmore Coll.,* 159 A.D.2d 926, 553 N.Y.S.2d 240 (3d Dep't 1990).

rated into an employee handbook or other document; (3) the plaintiff rejected offers of other employment in reliance on these assurances; and (4) the plaintiff was instructed to comply with the handbook because employees could only be discharged for just cause. *Weiner v. McGraw–Hill, Inc.,* 57 N.Y.2d 458, 465–66, 457 N.Y.S.2d 193, 443 N.E.2d 441 (1982).

These factors are not exclusive, however; "federal courts in this Circuit have weighed the totality of the circumstances to determine the existence of an express contractual right limiting the employer's right to discharge under New York law." *Townsend v. Harrison Radiator Div., GMC,* 760 F.Supp. 286, 289 (W.D.N.Y.1991).

After reviewing the Handbook relied upon by plaintiff, I find that he has not stated a cause of action for breach of contract. The Bylaws and Guidelines lack the kind of clearcut limitation on the Colleges' discretion in the tenure review process that would give Romer the contractual rights he attempts to assert here.

The facts of this case are in many ways similar to those in *De Simone v. Skidmore Coll.,* 159 A.D.2d 926, 553 N.Y.S.2d 240, (3d Dep't 1990). In that case, the plaintiff professor's faculty handbook, which was expressly incorporated into his employment contract, contained a provision entitled "standards for continued service." The handbook grouped the standards into the same three categories as those in the instant case (teaching effectiveness, professional accomplishment and community service). The court held that the plaintiff had failed to establish a breach of contract because the handbook did not contain any express limitation on the college's discretion in deciding whether to renew the plaintiff's employment contract after the initial three-year term expired.

In some respects, the facts of this case are even weaker than those in *De Simone.* For one thing, nowhere in the record does there appear any statement that the Bylaws and Guidelines were actually incorporated into Romer's contract. *Cf. Weiner,* 57 N.Y.2d at 460, 457 N.Y.S.2d 193, 443 N.E.2d 441 (job application specified that plaintiff's employ-ment would be subject to employer's policy and procedure handbook).

Moreover, assuming that defendants did undertake to abide by the terms of the Handbook, the Handbook does not contain the explicit assurances to tenure candidates that would give rise to a contract claim under the circumstances presented here. While the Bylaws do declare that the faculty "agree to conduct all proceedings" according to the Bylaws, (Bylaws p. 1), and that the tenure review procedure is intended to protect teachers from "abusive or arbitrary treatment," (Bylaws p. 6), there is no express *promise* that a teacher can guarantee himself tenure by meeting particular discrete, quantifiable criteria. In short, "the method of evaluating performance fairly as prescribed in the handbook does not impose express limitations on defendant's right to terminate." *Brumbach v. Rensselaer Polytechnic Inst.,* 126 A.D.2d 841, 843, 510 N.Y.S.2d 762 (3d Dep't 1987). *See Townsend,* 760 F.Supp. at 290 (statements in handbook that employees were entitled to "Protection from Unilateral Action" to ensure that personnel decisions would be "fair and equitable" did not constitute contractual limitations on employer's right to discharge employees).

To the contrary, both the Bylaws and the Guidelines disclaim any attempt to make tenure review a purely mechanical procedure. Both note that a candidate's qualifications "cannot be accomplished entirely by rule but [that] certain guidelines should systematically be invoked." Bylaws p. 6; Guidelines p. 12. The message is clear that tenure review should be guided by certain precepts, but that ultimately the method of deciding tenure cannot be reduced to a mathematical formula.

In addition, although the Handbook does list certain criteria for tenure, it does not indicate that the list is intended to be exclusive or exhaustive. *See Novinger v. Eden Park Health Serv.,* 167 A.D.2d 590, 591, 563 N.Y.S.2d 219 (3d Dep't 1990) (personnel policy manual's list of grounds for termination did not create contractual limitation on employer's right to discharge employee, since list was not exhaustive and manual did not indicate that stated procedure would be fol-

lowed in all cases), *app. denied,* 77 N.Y.2d 810, 571 N.Y.S.2d 913, 575 N.E.2d 399 (1991); *Marvin v. Kent Nursing Home,* 153 A.D.2d 553, 554, 544 N.Y.S.2d 210 (2d Dep't 1989) (same). Rather, the descriptions seem designed only to sketch the general parameters of the evaluation procedure.

The major impropriety alleged by plaintiff is COTAP's consideration of information concerning his relationship with Professor Sage. Plaintiff contends that the matters concerning Sage do not fall within any of the three categories of criteria contained in the Handbook. The question before this court, however, is whether the Handbook *expressly* limits or precludes the Colleges' right to consider such matters, thereby giving plaintiff a contractual right in this regard. I find that there is no such limitation. In fact, there is *explicit* authority in the Bylaws that relationships with students and faculty are an important aspect of a teacher's function. The Bylaws state that "teaching involves not only one's students but one's colleagues, and requires mutual respect and consideration." Bylaws p. 7.

The information before COTAP concerning Romer and Sage did not relate only to their private, off-campus relationship. There is no indication that COTAP was motivated simply by malicious curiosity into Romer's personal affairs. Rather, the information related to the effect that Romer's problems with Sage had on his students, other faculty members, and the Colleges as a whole. Even if the Bylaws and Guidelines did impose *some* limits on COTAP's discretion, it cannot be said that COTAP's opinion that this type of information relative to Romer's fractious relationship with a colleague was relevant to the written criteria was an abuse of that discretion.

Romer also contends that he received oral assurances from the then-provost of the Colleges that scholarship, teaching and community service were the "three and only three" criteria for tenure, and that if Romer "wrote a book review each year to show that [he] was not 'brain dead,'" tenure would be conferred after three years. Romer Aff. ¶¶ 5, 9. Even if true, however, those allegations cannot save plaintiff's breach of contract claim.

Although an employer's oral assurances of job security are an important factor to consider in deciding whether the employer has subjected itself to contractual obligations, such assurances "are not by themselves sufficient evidence of an express agreement" to create a contract. *Cucchi v. New York City Off-Track Betting Corp.,* 818 F.Supp. 647, 652 (S.D.N.Y.1993). Instead, oral assurances are but one factor among several that must be taken into account. *Id.; Weiner,* 57 N.Y.2d at 465–66, 457 N.Y.S.2d 193, 443 N.E.2d 441. Given the previously-discussed failure of proof of express limitations on defendants' right to deny Romer tenure, I find that the alleged oral promises do not establish contractual rights or duties. At most, these were general assurances of job security, which New York courts have found insufficient to create contractual commitments. *Townsend,* 760 F.Supp. at 291.

Furthermore, even if oral promises alone could give rise to contract rights, the alleged assurances here would not support the first cause of action. The provost's statement that only three factors would be taken into account adds nothing to what is contained in the Handbook; the salient question is whether defendants had the right to *interpret* those three categories to include information concerning a candidate's relationships with his colleagues. *See De Simone,* 553 N.Y.S.2d at 243.

The statement that Romer would get tenure as long as he published book reviews to show that he was not "brain dead" cannot seriously be construed to mean that book reviews alone would guarantee him tenure. In fact, such an interpretation would conflict with the provost's alleged statement that there were *three* types of factors that mattered. The only reasonable understanding of the provost's words is that he was referring to the "scholarship" category.

Romer's allegation that defendants did not follow the proper procedures for tenure review (as opposed to consideration of improper information) likewise fails to state a contract claim. Romer contends that defendants violated the Bylaws by allowing the personal opinions of Dean Fox to be raised

before COTAP instead of before the Departmental Committee. Complaint ¶ 29. He also alleges that William G. Thalmann from the University of Southern California was appointed to the Departmental Committee, whereas the Bylaws do not provide for outside faculty members to serve on the Committee. Complaint ¶ 25.

As with the criteria for tenure, however, the Bylaws do not expressly state that tenure review must invariably follow a specified, rigid procedure, or that a tenure decision could be invalidated if any variations in the procedure occurred. Furthermore, assuming that defendants could not legitimately have wholly abandoned all semblance of adherence to the prescribed procedures, the claimed deviations in Romer's case were too slight to sustain a breach of contract claim. COTAP forwarded Dean Fox's opinions to the Departmental Committee, which submitted its comments to COTAP. As to Thalmann, it is difficult to see how Romer could allege any harm to himself even if Thalmann were ineligible to serve on the Department Committee. Thalmann supported Romer's candidacy, and vehemently protested to the Colleges when he learned that Romer had been denied tenure. *See* Complaint Ex. I.

I conclude, therefore, that plaintiff has not stated a claim for breach of contract. The documents relied upon by plaintiff do not contain any express limitation on the Colleges' right to deny tenure. Moreover, even to the extent that the Bylaws and Guidelines can be read as setting forth certain mandatory procedures and criteria for tenure review, the facts alleged here do not show any departure from those procedures significant enough to support plaintiff's claim. The relief requested here, if available at all, could be sought only in an Article 78 proceeding. *See Faillace v. Port Authority of New York and New Jersey,* 130 A.D.2d 34, 43, 517 N.Y.S.2d 941 (1st Dep't) (appropriate vehicle for plaintiff to assert claim that he was wrongfully terminated from public office was Article 78 proceeding and not an action at law), *app. denied,* 70 N.Y.2d 613, 524 N.Y.S.2d 432, 519 N.E.2d 343 (1987). Since that avenue was not timely pursued and is now precluded by the statute of limitations,

the first cause of action must be dismissed. *See Gertler,* 107 A.D.2d 481, 487 N.Y.S.2d 565.

## II. Equitable Estoppel

■ In his second cause of action, plaintiff alleges that he relied upon the Handbook with respect to the procedures for obtaining tenure, and that defendants should be estopped from departing from that procedure concerning his candidacy.

This cause of action must be dismissed as well. "[T]he New York courts have concluded that '[t]he issuance of a manual by the employer ... does not create an equitable estoppel which would preclude the employer from terminating an employee's employment except in compliance with the manual.' " *Sherman v. St. Barnabas Hosp.,* 535 F.Supp. 564, 573 (S.D.N.Y.1982) (quoting *Edwards v. Citibank,* 100 Misc.2d 59, 418 N.Y.S.2d 269 (1979), *aff'd,* 74 A.D.2d 553 (1st Dep't), *app. dismissed,* 51 N.Y.2d 875, 433 N.Y.S.2d 1020, 414 N.E.2d 400 (1980)). To allow plaintiff to circumvent New York's "express limitation" rule of employment contracts by casting this claim as an estoppel claim would virtually eviscerate the rule.

Furthermore, the merits of this claim are closely tied to those of the first cause of action, since both claims are premised on the allegation that defendants breached their obligations under the Handbook. For the reasons given in the preceding discussion of the contract claim, I find that plaintiff has failed to show such a breach.

Plaintiff has also failed to show a false representation or concealment of material facts, which is an essential element of estoppel. *Deutsch v. Health Ins. Plan of Greater New York,* 573 F.Supp. 1433, 1440 (S.D.N.Y. 1983); *Gratton v. Dido Realty Co.,* 89 Misc.2d 401, 391 N.Y.S.2d 954, *aff'd,* 63 A.D.2d 959, 405 N.Y.S.2d 1001 (2d Dep't 1978). To establish this element, plaintiff would have to show that defendants knew that they were not going to follow the procedures in the Handbook, and that they concealed that fact from him. That plainly has not been shown here. While defendants obviously differ in their interpretation of certain provisions in the Handbook, there is no

basis for a finding that they concealed a willful departure from those provisions from plaintiff.

### III. Intentional Infliction of Emotional Distress

■ Plaintiff's claim for intentional infliction of emotional distress cannot stand. Plaintiff's allegations do not meet the standards for such a claim under New York law.

In *Murphy,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86, the plaintiff claimed that he had been fired because of his age and because of his disclosure to top management of alleged accounting improprieties on the part of other employees. The Court of Appeals held that the plaintiff's allegations "regarding the manner of his termination f[e]ll far short of th[e] strict standard" for this tort, which requires a showing of "conduct [which] has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 303, 461 N.Y.S.2d 232, 448 N.E.2d 86 (quoting Restatement (Second) of Torts § 46 cmt d).

Plaintiff's allegations in the instant case likewise fall short of the mark. Even assuming the truth of plaintiff's factual allegations, there is no basis here for an emotional distress claim.

### CONCLUSION

Defendants' motion for summary judgment is granted as to all causes of action, and the complaint is dismissed with prejudice.[5]

IT IS SO ORDERED.

---

5. This finding renders it unnecessary for me to decide the validity of defendants' argument that plaintiff did not effect proper service of process upon the Board.