PETER BERKOWITZ *vs.* PRESIDENT & FELLOWS of
HARVARD COLLEGE.

No. 01-P-525.

Middlesex. October 8, 2002. - June 6, 2003.

Present: JACOBS, COWIN, & KAFKER, JJ.

*Education,* Private colleges and universities, Tenure of college professor.
*Contract,* Private college.

Discussion of the principles stated in *Schaer v. Brandeis University,* 432
Mass. 474 (2000), and in Federal cases, that university contracts are to be
interpreted pursuant to the standard of "reasonable expectation," and that
absent a violation of a contractually created reasonable expectation, or
arbitrary or capricious conduct by the university, courts are not to intrude
into university decision-making. [269-270]

In a civil action brought by a professor alleging breaches of contract and
common-law duty by a university in denying him tenure without properly
following the process outlined in the university's appointment handbook
(handbook), the judge erred in denying the university's motion to dismiss
the complaint, where the decision of the committee considering the profes-
sor's grievance to dismiss the grievance as "clearly without merit" pursu-
ant to a preliminary screening did not violate the handbook, in that nothing
in the handbook's language or purpose supported excluding the professor's
academic adversaries or such academic adversaries' associates from
participating in the tenure review process [270-271, 272-273], and as noth-
ing in the handbook required that any member of the ad hoc tenure review
committee be an expert in the "narrow subject-matter areas" of the profes-
sor [271-272].

In a civil action brought by a professor alleging breaches of contract and
common-law duty by his university employer in denying him tenure
without properly following internal grievance procedures outlined in the
university's appointment handbook (handbook), the judge erred in denying
the university's motion to dismiss the complaint, where the committee
considering the professor's grievance did not exceed its authority in
undertaking a careful investigation of the plaintiff's grievance pursuant to
the handbook's "preliminary screening" provision, absent handbook
language expressly limiting the committee's powers of inquiry. [273-275]

Where a university's appointment handbook provided for an internal griev-
ance procedure in tenure disputes, the judge in a civil action brought by a
professor who had been denied tenure erred in allowing the plaintiff to
amend his complaint to include a new claim not subjected to internal

grievance proceedings, where the plaintiff instead could have sought a stay of the ongoing judicial proceedings while returning to the appropriate committee when he discovered the new claim, because the parties contracted for an opportunity to address issues first outside the litigation forum, and because courts should not interpret contested contractual provisions without the benefit of the internal grievance committee's interpretation of those provisions. [275-277]

CIVIL ACTION commenced in the Superior Court Department on March 3, 2000.

A motion to dismiss and a motion to amend the complaint were heard by *Raymond J. Brassard*, J., and the case was reported by him.

*George Marshall Moriarty* (*Richard D. Batchelder, Jr.*, with him) for the defendant.

*David A. Handzo* of the District of Columbia (*Matthew H. Feinberg* with him) for the plaintiff.

KAFKER, J. When Harvard University denied tenure to the plaintiff, Associate Professor Peter Berkowitz, he filed a grievance pursuant to the university's[1] appointment handbook. The grievance was dismissed as "clearly without merit" by the committee that performs the preliminary screening of faculty grievances. Thereafter, the plaintiff brought suit claiming that the committee exceeded its powers in dismissing the grievance. As we conclude that the conduct he grieved contravened neither the language nor the purpose of the appointment handbook, and that the committee was expressly authorized to screen out and dismiss claims that were "clearly without merit," we reverse the trial court order denying the university's motion to dismiss the complaint. We further conclude that the trial court erred in allowing the plaintiff to amend his complaint to allege an appointment handbook violation that had never been subjected to the university's internal grievance procedure.

I. *Background.* A. *The appointment handbook.* The appointment handbook (handbook) provides that "[t]enured professorial appointments are reserved for scholars of the first order of

---

[1]Although the President and Fellows of Harvard College, a corporation, is the named defendant in this action, for convenience we refer to the defendant as the university.

eminence." It includes procedures for a multifaceted review of a tenure candidate and comparison of the candidate with other distinguished scholars. When a candidate (also referred to as a nominee) is being considered for tenure, the candidate's academic department "evaluates relevant scholars and ordinarily reduces the number to a short list of [five] or [six] leading contenders who, as much as possible, are comparable in ability, distinction, and career stages." When considering names for the short list, the department is not to exclude scholars "on an assumption, or direct knowledge, that they will not be available." The department then sends the short list to other outstanding scholars in the field, requesting that they rank and compare those on the list, and soliciting suggestions for additions to the list. Minority outreach is also ongoing. The department then votes on the candidate. Thereafter, the department chair prepares an extensive dossier on the candidate. Included in the dossier, along with the nominee's publications and curriculum vitae, the department vote, information on the other scholars on the short list and extensive additional materials, is "a confidential letter from each voting member of the department." Each voting member of the department is authorized and expected to submit such a letter regarding the nominee. The dossier is forwarded to the university's office of the dean of the faculty of arts and sciences (dean).

After receiving the complete dossier, the dean asks the president of the university (president) to convene an ad hoc committee. "The purpose of the ad hoc committee review is to assure that the [u]niversity takes the broadest possible view of opportunities to recruit the ablest people and to make certain that nominees are judged strictly on their merits as scientists, scholars and teachers. The committee is ordinarily composed of [three] or [four] scholars ('generalists' as well as 'specialists') from outside the [u]niversity, [two] tenured members of the [f]aculty from outside the department, and (ex officio) the [d]ean and the [p]resident."

The ad hoc committee, after reviewing the dossier and hearing departmental witnesses, advises the president on:

"1. the importance of the [nominee's] field to the long-term development of the department; and

"2. the quality of the proposed nominee."

The final decision on tenure is made by the president.

As provided in appendix X of the handbook ("Guidelines for the Resolution of Faculty Grievances"), "[a]ny faculty member may bring forward for resolution . . . any grievance . . . which contends that proper procedures have not been followed in decisions regarding promotion." Pursuant to section 3(b) of appendix X, grievances are submitted "to the elected members of the [d]ocket [c]ommittee of the [f]aculty for preliminary screening." The section provides that the elected members of the docket committee[2] are "empowered to dismiss the complaint if it is found to be clearly without merit."

B. *The plaintiff's grievance.* In April, 1997, the president denied tenure to the plaintiff, an associate professor in the university's department of government. The plaintiff thereafter filed a grievance pursuant to the handbook. In the grievance letter sent to the docket committee and referenced in the complaint, the plaintiff claimed bias on the part of Dennis F. Thompson (Thompson), an associate provost and professor of government. The plaintiff also claimed bias on the part of some members of the ad hoc committee and claimed that the committee lacked specialists in his field. He "emphasize[d] that these grievances — both concerning the composition of the ad hoc committee and concerning . . . Thompson's participation in [his] tenure review — focus[ed] on procedural flaws and [did] not address the motives or character of those involved."

In particular, the plaintiff asserted in his grievance that Thompson "compromised the integrity of the tenure review process in [his] case by taking part in deliberations in the [d]epartment of [g]overnment and by participating by means of [Thompson's] confidential letter to the [d]ean in the deliberations of the [o]ffice of the [d]ean, the ad hoc committee, and the president." In regard to the ad hoc committee, the plaintiff claimed that the provision stating that the committee will "ordinarily" be composed of both specialists and generalists was violated. He contended that the committee lacked specialists who could consider his primary field, the history of political

[2]The docket committee is elected by the university faculty.

philosophy; his book, "Nietzsche: The Ethics of an Immoral-ist"; and his manuscript, "Virtue and the Making of Modern Liberalism."[3] He also claimed bias against him on the part of committee members due to their professional contacts with Thompson. One member had attended graduate school with Thompson and had written a favorable blurb for a book cover of an author that the plaintiff had sharply criticized. Another, as codirector of "the Program in Mind, Brain, and Behavior," was a member of the offices of the provost and president, and therefore an administrative colleague of Thompson.

After reviewing the plaintiff's grievance, the handbook, and the docket committee's collective understanding regarding the tenure process at the university, and after consulting with legal counsel and "gather[ing] additional information that [the docket committee] felt was necessary . . . to reach a decision," the docket committee concluded the grievance was "clearly without merit." In regard to Thompson's participation in the tenure review process, the docket committee wrote: "We are not aware of any published rule . . . that requires a member of a departmental faculty who also holds an official position in the [u]niversity to excuse himself or herself from the obligation imposed on members of a department to express their views regarding tenure candidates in their department." Moreover, the docket committee understood that "professors who hold official posts traditionally consider their role as members of their home departments to be paramount. They therefore routinely express themselves regarding tenure cases when those cases are discussed in their departments, and write the letters for ad hoc

---

[3]In his grievance the plaintiff described the five committee members as follows. Ellen Kennedy, a professor of political science at the University of Pennsylvania, was a co-editor of "Women in Western Political Philosophy: Kant to Nietzsche." Isaac Kramnick, a professor of government at Cornell University, was the "author of many books dealing with the history of Anglo-American political thought from the eighteenth century to the present." The plaintiff recognized that Kramnick "[brought] relevant expertise to bear on [the plaintiff's] work on liberalism but not on [his] work on Nietzsche." Leon Kass, a professor of social thought at the University of Chicago, was a leading scholar on ethics. The plaintiff alleged that the two professors from the university — Jerome Kagan, a professor of psychology, and Maria Tatar, a professor of German — had no relevant expertise.

tenure review committees and the [p]resident that are required by the [handbook]."

The docket committee also concluded that Thompson's dual role did not improperly intrude on the decision-making of the dean or the president. The docket committee concluded that as associate provost, Thompson had "no formal or informal supervisory function over the Deans." In regard to the president, the docket committee emphasized that the president has the "sole discretion" to decide tenure cases, and that discretion included the right to consult with whomever the president pleased.

As for the composition of the ad hoc committee, the docket committee stated that "even if the facts were as you state, that would not present a case of a procedural error in the formation of your ad hoc tenure review committee." The docket committee rejected the contention that "scholarly differences" alone could amount to prohibited bias or conflict of interest. It also concluded, after review of the university's rules and practices, that it was "not aware of any requirement that any member of an ad hoc tenure review committee, much less the committee as a whole, be expert in the narrow subject-matter areas of the tenure candidate whom they review." The docket committee explained, "universities in general, and Harvard University in particular, hold the view that information is not tethered to a particular narrow field of expert knowledge, but exists in a way that can be assessed by others in different fields, who can tell exceptional quality when they see it."

C. *The complaint.* In the complaint he filed in Superior Court, the plaintiff alleged breaches of contract and common law duty by the university. He claimed that his "grievance presented meritorious, reasonable and credible complaints" that proper procedures were not followed in the decision to deny him tenure. He further claimed that the bias, lack of expertise and conflicts of interest among members of the ad hoc committee prevented him from being judged strictly on his merits as required by the handbook. He contended that these "plain violations" of the handbook could not have been properly dismissed as "clearly without merit" by the docket committee. He further

alleged that the docket committee exceeded its expressly limited mandate by undertaking an investigation, rather than a "preliminary screening," of the grievance, thereby "usurping" the role of the ad hoc grievance committee, which would have performed the review in the next step in the grievance process.

The handbook provides that one of the three members of the ad hoc grievance committee would have been selected by the plaintiff. The plaintiff would also have had a right to appear before the committee, and if the committee allowed, to have access to confidential documents. Finally, he would have had the right to receive and respond to the committee's draft report before the report was sent to the dean. The dean could take whatever action he believed the ad hoc grievance committee's report warranted.[4]

By his motion to amend his complaint, filed two years after his grievance and nine months after his original complaint, the plaintiff sought to add counts alleging violation of the "short list" provision of the handbook. He claimed that the short list on which his name appeared did not include scholars comparable in "distinction and career stages" because "several of the short list scholars had advanced substantially further in their careers" than he had, having received their doctorates while he was in either high school or college. Six of the seven had also been tenured. He further alleged that comparable scholars were excluded from the list. He stated he was unable to learn the names on the short list until after he filed his grievance, because the university kept the list confidential. The plaintiff never presented the docket committee a grievance concerning the short list.

A Superior Court judge allowed the plaintiff to amend his complaint to include the short list claim, and denied the university's motion under Mass.R.Civ.P. 12(b)(6), 365 Mass. 755 (1974), to dismiss all claims. On the university's request for a report to this court, the judge found that his denial of the university's motion to dismiss so affected the merits of the case that the propriety of his order should be reviewed here. As a

---

[4]Although not explicitly stated in the handbook, there is no doubt that the decision concerning tenure remains with the president.

result he stayed further proceedings in Superior Court and reported his order to this court for determination. See G. L. c. 231, § 111; Mass.R.Civ.P. 64(a), as amended, 423 Mass. 1403 (1996).

II. *Discussion.* In interpreting a university contract,[5] we are guided by two fundamental principles set out in *Schaer* v. *Brandeis Univ.*, 432 Mass. 474 (2000). First, we employ the "standard of 'reasonable expectation — what meaning the party making the manifestation, the university, should reasonably expect the other party to give it.' " *Id.* at 478, quoting from *Cloud* v. *Trustees of Boston Univ.*, 720 F.2d 721, 724 (1st Cir. 1983). See *Lyons* v. *Salve Regina College*, 565 F.2d 200, 202 (1st Cir. 1977), cert. denied, 435 U.S. 971 (1978). Second, we "adhere to the principle that '[c]ourts are chary about interfering with academic . . . decisions made by private colleges and universities." *Schaer* v. *Brandeis Univ.*, 432 Mass. at 482, quoting from *Schaer* v. *Brandeis Univ.*, 48 Mass. App. Ct. 23, 26 (1999). See *Beitzell* v. *Jeffrey*, 643 F.2d 870, 875 (1st Cir. 1981) ("Given the university's overall mission, the creation and transmission of knowledge, the very need for strong procedural protections to prevent the wrongful dismissal of a tenured teacher concomitantly suggests a need for wide discretion in making an initial tenure award"); *Kumar* v. *Board of Trustees, Univ. of Mass.*, 774 F.2d 1, 12 (1st Cir. 1985), cert. denied, 475 U.S. 1097 (1986) (Campbell, C.J., concurring) ("[C]ourts must be extremely wary of intruding into the world of university tenure decisions. These decisions necessarily hinge on subjective [judgments] regarding the applicant's academic excellence, teaching ability, creativity, contributions to the university community, rapport with students and colleagues, and other factors that are not susceptible of quantitative measurement"). Therefore, in the absence of a violation of a reasonable expectation created by the contract, see *Schaer* v. *Brandeis Univ.*, 432 Mass. at 478, or arbitrary and capricious conduct by the university, see *Coveney* v. *President & Trustees of the College*

---

[5]For the purpose of the motion to dismiss, the university assumed that the handbook constituted a contract.

*of the Holy Cross*, 388 Mass. 16, 19-20 (1983), courts are not to intrude into university decision-making.[6]

In considering a motion to dismiss under Mass.R.Civ.P. 12(b)(6), we accept as true the factual allegations of the complaint, as well as any reasonable inferences that may be drawn from the facts therein alleged.[7] "However, we do not accept legal conclusions cast in the form of factual allegations." *Schaer* v. *Brandeis Univ.*, 432 Mass. at 477. The interpretation of the contract itself generally presents a question of law for the court. *Suffolk Constr. Co.* v. *Lanco Scaffolding Co.*, 47 Mass. App. Ct. 726, 729 (1999). Whether or not a contract is ambiguous is also a question of law for the court. *Fashion House, Inc.* v. *K Mart Corp.*, 892 F.2d 1076, 1083 (1st Cir. 1989).

A. *Allegations in grievance.* In order to determine whether the docket committee improperly dismissed the grievance, we need to consider the underlying alleged procedural violations that the docket committee was being asked to address involving Thompson and the ad hoc committee, and then determine whether the docket committee, in a preliminary screening, could properly determine that the claims in the grievance were clearly without merit.

1. *Participation of Thompson.* As the docket committee recognized, no provisions in the handbook prevented Thompson, because of his part-time position as associate provost, from submitting a confidential letter. Indeed, the handbook stated that each faculty member in the nominee's department should submit a confidential letter giving the writer's view of the nominee. The purpose of such letters is to inform the president fully of each member's views; there was no disqualification for the nominee's friends or foes in the department. As an associate

---

[6]This is not a case in which a plaintiff alleges discrimination based on prohibited classifications such as age, sex or race, where the courts owe no deference to the university.

[7]Although not physically attached to the complaint, the grievance and docket committee decision were referenced in the complaint and are considered part of it. See *Allen* v. *Westpoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991); *Paulemon* v. *Tobin*, 30 F.3d 307, 308-309 (2d Cir. 1994). Cf. *Marshall* v. *Stratus Pharmaceuticals, Inc.*, 51 Mass. App. Ct. 667, 672 (2001). These two documents are central to the breach of contract claim alleged against the docket committee, as they define the grievance being considered by the docket committee and the docket committee's action.

provost, Thompson did not give up his rights or obligations as a department member.

Moreover, the handbook sets out a rigorous tenure review process designed to generate for the president's consideration a comprehensive range of opinions about the nominee as well as comparisons to other distinguished scholars. As the ultimate decision maker, the president was not beholden to the associate provost or anyone else. The president was as free to consider, accept, or reject Thompson's views as he was those of others inside and outside the university. In sum, nothing in the contract language or purpose supports exclusion of Thompson from participating in the tenure review process.[8] See *Logan* v. *Bennington College Corp.*, 72 F.3d 1017, 1024 (2d Cir.), cert. denied, 519 U.S. 822 (1996); *Romer* v. *Board of Trustees of Hobart & William Smith Colleges*, 842 F. Supp. 703, 709 (W.D. N.Y. 1994).[9]

*2. Ad hoc committee claims.* We likewise conclude that the docket committee did not violate the handbook when it screened out and dismissed as clearly without merit the grievance regarding the composition of the ad hoc committee. In his amended complaint, and similarly in his grievance, the plaintiff alleged that "none of the members of the [a]d [h]oc [c]ommittee . . . were specialists with respect to the writings of Nietzsche or contemporary liberal political theory."[10] However, when "we employ the standard of reasonable expectation — what meaning

---

[8]The plaintiff also claimed in his grievance that Thompson's involvement was improper because Thompson was married to the university's associate dean for academic affairs, Carol J. Thompson, who the plaintiff alleged was "administratively connected to [his] tenure review in a variety of potentially decisive ways." We see no basis for disagreement with the docket committee's conclusion that Associate Dean Thompson's connection to Thompson did not violate any handbook provisions and did not affect the outcome of the proceeding.

[9]The plaintiff also argued in his grievance that the university has violated its own practices in this regard. His grievance referred to a statement made by a former provost of the university that while serving as provost, he declined to participate in the affairs of his department. As the docket committee recognized, however, the full-time position of provost is different from a part-time associate provost. Moreover, there was nothing in the handbook precluding the provost's involvement in department affairs.

[10]The grievance further clarifies the narrowness of the plaintiff's definition of the word "specialist." He recognizes that one member of the committee

the party making the manifestation, the university, should reasonably expect the other party to give it," *Schaer* v. *Brandeis Univ.*, 432 Mass. at 478 (quotation omitted) — we find no reasonable basis for his contractual interpretation of the meaning of specialists.

The alleged violation is based on the handbook provision that states "the [ad hoc] committee is ordinarily composed of [three] or [four] scholars ('generalists' as well as 'specialists')." The handbook contains no further definition of specialists. In determining its meaning in this context, we consider that the ad hoc committee's review of the candidate's work is only one of several provided for the president pursuant to the handbook. The department's faculty members also weigh in, as well as outside scholars consulted to review the short list. The ad hoc committee is therefore not the sole source of specialized review of the nominee.

The docket committee concluded that the plaintiff's claim regarding the absence of appropriate specialists on the ad hoc committee was clearly without merit, as there was no requirement that any member of the ad hoc tenure review committee, much less the committee as a whole, be expert in the "narrow subject-matter areas" of the tenure candidate. It further concluded that its inquiry into the customs and traditions of the university had not disclosed such requirement.

We conclude that the handbook language and structure could create no reasonable expectation to support the plaintiff's interpretation. Moreover, the question of who is or is not a specialist is an area that courts are particularly ill-suited to judge in the absence of clear direction from the university itself.

The plaintiff's claim of bias based on scholarly differences can be disposed of with dispatch. There is no basis to consider such differences to be grounds for disqualification. We are therefore left with his claims of bias arising out of the association between various members of the ad hoc committee and Thompson. The plaintiff claims that these relationships

brought "relevant expertise to bear on [the plaintiff's] work on liberalism but not on [his] work on Nietzsche." Professors of ethics, German, and government he also considered too far afield.

prevented the ad hoc committee from "mak[ing] certain that nominees [were] judged strictly on their merits."

As we have concluded that Thompson's participation was not precluded by the contract, other committee members were likewise not precluded because of association with Thompson. The purpose of the "strictly on the merits" provision that the plaintiff relies on is to assure the broadest possible input into a rigorous selection process. Academic adversaries, as Thompson is alleged to be, are not meant to be excluded from the process. Nor are the associates of the nominee's adversaries. The docket committee's decision to dismiss this grievance as "clearly without merit" pursuant to a preliminary screening did not violate the appointment handbook.

B. *Scope of docket committee review of plaintiff's grievance.* The plaintiff argues that the dismissal of his grievance was improper in that the docket committee exceeded the permissible scope of a "preliminary screening." He objects to the decision by the docket committee to conduct an inquiry to make sure that there were no rules or even customs that it was not aware of concerning the composition of the ad hoc committee and the associate provost's participation. We conclude that the plaintiff reads undue restrictions into the handbook provision that states grievances are submitted to the docket committee "for preliminary screening." Appendix X of the handbook sets out a multistage review process for grievances that contend "proper procedures have not been followed." The first formal screening is performed by the docket committee and the second by an ad hoc grievance committee. In its preliminary screening, the docket committee filters out grievances that are "found to be clearly without merit," leaving those grievances that it believes raise meritorious issues for the ad hoc grievance committee.

The plaintiff contends that the inquiry undertaken by the docket committee exceeded its powers. The docket committee's investigation included hiring outside legal counsel, interviewing witnesses, and gathering and weighing evidence and interviewing the plaintiff and his tenure advisor. The scope of the inquiry contemplated in the docket committee's preliminary screening is not defined or in any way limited in the handbook. The docket committee is simply charged with determining whether proper

procedures have been followed and screening out those grievances that are "found" to be clearly without merit. There is nothing to suggest that a preliminary screening, particularly in regard to a tenure process, where the stakes on both sides are very high, cannot be a careful and conscientious one to ensure that the grievance is clearly without merit. Requiring a finding to this effect further supports this interpretation.

The plaintiff argues that a grievance is not "clearly without merit" if it requires such extensive follow-up inquiry, and that such a grievance belongs in the ad hoc grievance committee. This grievance, however, involved a tenure decision, which is by definition an important, and often fiercely contested one. It was also "the first [written, formal grievance] ever presented to the [e]lected [m]embers [of the docket committee] under the [handbook's] [g]uidelines" and therefore the committee was not "able to rely on established precedents." The docket committee therefore proceeded deliberately and undertook some follow-up inquiry. In the absence of handbook language expressly limiting the docket committee's powers of inquiry, we are reluctant to read in restrictions that limit the university's discretion. See *Schaer* v. *Brandeis Univ.*, 432 Mass. at 481 ("It is not the business of lawyers and judges to tell universities what statements they may consider and what statements they must reject"). See also *Holert* v. *University of Chicago*, 751 F. Supp. 1294, 1301 (N.D. Ill. 1990) ("Because the relationship . . . was strictly contractual in nature, [the plaintiff] was entitled only to those procedural safeguards that the University agreed to provide"); *Romer* v. *Board of Trustees of Hobart & William Smith Colleges*, 842 F. Supp. at 709 ("The question before this court . . . is whether the Handbook *expressly* limits or precludes the Colleges' right to consider such matters"). We also do not interpret the existence of the additional procedures assigned in the handbook to the ad hoc grievance committee to preclude further inquiry by the docket committee.

Finally, our task is simplified by the clear lack of merit of the underlying grievances themselves, which has been explained above. Where the underlying grievances being preliminarily screened are without support in the contract, we discern no prejudice to the plaintiff arising out of the docket committee's

double-checking of its work through further inquiry. See *Holert* v. *University of Chicago*, 751 F. Supp. at 1301 (university conducted its proceedings in substantial compliance with university standards); *Romer* v. *Board of Trustees of Hobart & William Smith Colleges*, 842 F. Supp. at 710.

C. *Short list claim.* The plaintiff also contends that the university violated the handbook provision regarding the preparation of the short list, which states: "The department evaluates relevant scholars and ordinarily reduces the number to a short list of [five] or [six] leading contenders who, as much as possible, are comparable in ability, distinction, and career stages."

The problem for the plaintiff is that the short list claim has never been grieved. In *O'Brien* v. *New England Tel. & Tel. Co.*, 422 Mass. 686, 695 (1996), the court required that a plaintiff exhaust internal grievance procedures before resorting to the courts. That case involved contractual rights arising out of a personnel manual in a corporate setting. Its reasoning was applied by the United States Court of Appeals for the First Circuit in *Brennan* v. *King*, 139 F.3d 258, 270 (1st Cir. 1998), to a tenure dispute at a university that had established an internal grievance procedure in its faculty handbook.

Although in both of those cases the employees skipped the grievance procedure altogether and sought to go directly to court with all of their claims, we conclude that the logic of the cases applies here as well. Where employment rights are contractual, and the contract establishes an internal grievance procedure for resolving disputes, the procedure ought to be followed. This is true for individual claims, even when the claimant has already grieved and commenced litigation on other claims.

There are a number of reasons for the exhaustion requirement. First and foremost, it is part of the contractual bargain and defines the rights themselves. Second, it allows the contracting parties to educate each other as to their respective conceptions of the meaning of the contract. Finally, it allows the contracting parties an opportunity to work out their differences, and preserves scarce judicial resources.

The motion judge, without directly addressing the exhaustion

requirement, found that "[i]n light of [the] conclusion . . . that the remainder of the amended complaint states a claim, it would be impractical to dismiss the short list claim and would elevate form over substance to require the parties to engage in the grievance process at this time."

The parties, however, contracted for a process requiring that claims go before the docket committee to determine whether they are clearly without merit. The parties have not yet had an opportunity to address this issue outside the litigation forum. Finally, the courts should not be interpreting the short list provision without the benefit of the docket committee's interpretation — or for that matter, any interpretation of the contract by the university itself, except that first advanced by its litigators. With the docket committee's interpretation, all parties to the dispute and the respective trial and appellate courts interpreting the matter would be better informed.[11]

We recognize that the university's decision to keep the short list confidential disadvantaged the plaintiff. A particularly cautious plaintiff might have contested that decision before the docket committee and forced the issue. However, we think that requires too much of the plaintiff, who was without the benefit of hindsight. Nevertheless, once the claim was discovered, the

---

[11]The plaintiff argues that the provision is clear on its face and means that contenders on the short list must be comparable at least in terms of the number of years they have been scholars since receiving their doctorates. The purpose and language of the provision, however, call into question the interpretation proposed by the plaintiff. The purpose of the provision is to promote the objective of granting tenure to "scholars of the first order of eminence." To promote that objective, the short list is not meant to be limited by the availability or even interest of the scholars included on the list. The university has also not defined its objective as picking the best of that year's class of tenure candidates.

The language itself is not procrustean. The handbook states that the list "ordinarily" should include scholars, who "as much as possible" are "comparable in ability, distinction, and career stages." Ability, distinction, and career stages each bring to bear different considerations. The three criteria also allow different types of comparisons, particularly when they are mixed and matched: proven ability versus early promise, recognized distinction versus even greater possibility, rapid trajectories versus steady ascents, bursts of activity followed by relative "burnout." The university can compare scholars at different career stages. The university in this provision has not limited itself. The overall objective is not picking people like the plaintiff, but picking the best person for tenure.

plaintiff had a choice: he could move forward in court with the other claims or seek a stay of the judicial proceedings, while returning to the docket committee. Instead he sought a third way, which was to seek to amend the complaint to add a claim that has not been considered by the docket committee and to seek relief that would skip the docket committee. We conclude that the trial court's decision to allow an amendment of the complaint and to deny a motion to dismiss based on failure to exhaust was incorrect.

III. *Conclusion.* For the reasons stated above, the motion judge's orders denying the university's motion to dismiss and allowing the plaintiff's motion to amend are vacated, and an order shall enter allowing the university's motion to dismiss the original complaint.

*So ordered.*